UNITED STATES of America, Plaintiff-Appellee,

v.

STANDARD OIL COMPANY et al., Defendants-Appellants.

Nos. 13429–13439.

United States Court of Appeals Seventh Circuit.

April 22, 1963.

Rehearing Denied June 7, 1963.

Merwin Bristol, Robert H. Bork, Hammond E. Chaffetz, Walter T. Kuhlmey, Chicago, Ill., Joseph DuCoeur, Washington, D. C., Gordon H. S. Scott, Melvin R. Goldman, Chicago, Ill. (Richard J. Farrell, Ernest L. Godshalk, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel), for defendant-appellant Standard Oil Co.

Edward F. Howrey, Joseph B. Kennedy, Jr., Washington, D. C. (John J. Scott, Paul E. Bermingham, J. Arthur Kelly, New York City, Philip B. Raue, Niles, Ill., Howrey, Simon, Baker & Murchison, Washington, D. C., Henry C. Moses, New York City, of counsel), for defendant-appellant Socony Mobil Oil Co., Inc.

Alan W. Boyd, Thomas M. Scanlon, Raymond W. Gray, Jr., Indianapolis, Ind. (Clayton Orn, William K. Tell, Calvin A. Brown, Findlay, Ohio, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel), for defendant-appellant Ohio Oil Co.

Walter L. Barnes, Bartlesville, Okl., Howard Neitzert, Howard P. Robinson, Chicago, Ill., Bruce C. Hammerschmidt, South Bend, Ind. (Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel), for defendant-appellant Phillips Petroleum Co.

Gentry Lee, Cecil C. Cammack, Russell H. Smith, Bartlesville, Okl., E. Gray Hayden, New York City, for defendant-appellant Cities Service Petroleum Co.

Amzy B. Steed, New York City (Milton Handler, Stanley D. Robinson, Cecelia H. Goetz, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for defendant-appellant Texaco Inc.

Paul R. Teetor, New York City, (William F. Kenney, S. Russell Vandivort, New York City, of counsel), for defendant-appellant Shell Oil Co.

Edward R. Adams, Chicago, Ill., M. Edward Doran, South Bend, Ind. (Miller, Gorham, Wescott & Adams, Chicago, Ill., of counsel), for defendant-appellant Central West Oil Corp.

Louis Shifrin, St. Louis, Mo. (Shifrin, Treiman, Agatstein & Schermer, St. Louis, Mo., of counsel), for defendant-appellant Tornado Oil Co., Inc.

Irving C. Klinock, Kansas City, Kan., for defendant-appellant Hudson Oil Co.

William F. McInerny, South Bend, Ind. (Chapleau, Roper, McInerny & Farabaugh, South Bend, Ind., of counsel), for defendant-appellant Pacer Oil Co., Inc.

Earl A. Jinkinson, Raymond P. Hernacki, Chicago, Ill., Richard A. Solomon, Anti-Trust Div., Dept. of Justice, Washington, D. C., Alfred W. Moellering, U. S. Atty., Fort Wayne, Ind., Robert L. Eisen, Lawrence H. Eiger, Chicago, Ill., Robert B. Hummel, Cleveland, Ohio, Joel E. Hoffman, Michael J. Miller, Washington, D. C., for appellee.

Before DUFFY, CASTLE and KILEY, Circuit Judges.

DUFFY, Circuit Judge.

We have before us eleven appeals from separate judgments of conviction based upon jury verdicts finding each defendant guilty of having on or about May 1,

1957, conspired to raise and/or induce its dealers to raise, or induce its jobbers to raise, retail gasoline prices in the South Bend, Indiana, area in violation of Section 1 of the Sherman Act (26 Stat. 209, 15 U.S.C. § 1).

Thirteen defendants were named in the indictment. However Sun Oil Company was dismissed before the case went to the jury. Among those found guilty was Gulf Oil Corporation, but thereafter the trial court granted Gulf's motion for a judgment of acquittal.

The appellants are seven "major" and four "independent" companies.[1] In the first category are Standard Oil Company (Standard), Socony Mobil Oil Company (Socony), The Ohio Oil Company (Ohio), Phillips Petroleum Company (Phillips), Cities Service Oil Company (Cities Service), Texaco Inc. (Texaco), and Shell Oil Company (Shell). The independents are Central West Oil Company (Central West), Tornado Oil Company, Inc. (Tornado), Hudson Oil Company of Illinois, Inc. (Hudson), and Pacer Oil Company (Pacer).

The trial court fined Standard and West Central each in the amount of $50,000. The other "major" companies were each fined $45,000. Hudson, Tornado and Pacer were fined $30,000, $20,000 and $5,000, respectively.

The "market area" referred to throughout this record included the cities of South Bend, Roseland and Mishawaka, and the immediate surrounding areas in the State of Indiana. All of this area is within a few miles from the Michigan state line.

The so-called gasoline price war in the area described, dated from March 15, 1957 when the State of Indiana increased its gasoline tax by two cents a gallon. This brought the Indiana tax to a level with the Michigan gasoline tax.

Prices in the area were generally raised two cents a gallon to cover the tax increase. Major brand stations typically

went to 32.9 cents per gallon and independents to 30.9 cents a gallon. Prior to March 15, 1957, a two cent per gallon differential between major and independent companies had existed in this market for some years.

A number of independents in the area were of the opinion that any price above 29.9 cents per gallon diminished the price appeal of their product. For some psychological reason, the 30 cents per gallon barrier was not to be breached. This was especially true in Roseland which was located on a main highway not far distant from the Michigan state line.

On March 19, 1957, the independents in Roseland started cutting prices. The practice stopped temporarily but started again on March 28th, spreading to South Bend and Mishawaka and also spreading to major companies' stations. The majors began lowering their tank wagon prices to lighten the burden of the price war on their dealers. By April 1, gasoline prices were down four cents per gallon from the pre-price-war level.

On April 1, Central West, which was the largest independent in the South Bend area, decided to increase its prices to the pre-price-war level, effective April 3. It notified certain of its competitors including Standard, that it intended to take such action. The Division Manager of Standard was on vacation, but his assistant, Paul Troup, decided to raise Standard's tank wagon price effective April 3, and to suggest to its Standard dealers that they raise the retail price of the pre-price-war level.

Although Central West increased its price to 30.9 cents per gallon on April 3rd, it was apparent by April 6 that some stations in the area had not advanced their price or, if they had done so, had again reduced them. Within two or three days, all price increases had been rescinded. From April 12 to April 17, there were further drastic price reductions to a low of 24.9 cents for the major companies, and 22.9 cents for the inde-

---

1. The terms "major" and "independent" were used throughout the trial to distinguish integrated oil companies from those engaged in retailing only.

pendents for regular gas. These low prices prevailed until May 1st.

The Dealers' Association which claimed to represent most dealers in the South Bend area, put great pressure on the oil companies for a restoration of normal gasoline prices. The Association invited all the oil companies in the area to send representatives to a meeting held on April 25, 1957, which meeting was called to discuss means for ending the price war. All of the companies but two refused to attend, and the representatives of the two who did attend, declined to participate in the meeting but remained only as observers. The Dealers' Association also threatened to seek the aid of the Teamsters Union to bring about an end to the price war.

The price war hurt every oil marketer in the area, independents and majors alike. The testimony showed that Central West was losing more than $500 a day. Independent Pacer's gross margin was less than two cents a gallon, but direct labor costs at its three stations ranged from 3.47 to 4.47 cents per gallon. Hence, Pacer had a substantial out-of-pocket loss for every gallon of gasoline that it sold.

The majors' losses in the price war were very substantial. In April alone, Shell paid out $30,000 in temporary price allowances to its dealers. Many Standard dealers lost more than $350 a month. One Socony Mobil dealer testified he sustained $400 per month loss.

It is very clear from this record that every gasoline marketer in the area devoutly hoped for an early end to the price war. The dealers were eager and anxious to increase their retail price in their own economic self-interest. Dealers and oil companies alike were anxious to follow any market rise in gasoline prices and they needed no urging or pressure from any source to do so.

Johnson, president, and Parker, vice president, of Central West, discussed the situation daily. On April 25, Parker called Lee of Standard who was at Wabash, Indiana, attending a meeting of five hundred of his dealers. Parker told Lee that Central West was considering raising its price. Lee ended the phone call quickly because he was busy with the dealers' meeting.

On April 26, Johnson and Parker decided to raise Central West's pump prices on May 1 to 29.9 cents per gallon. They chose the 29.9 cent price because other independents had defeated the April 3rd price raise by refusing to go above that figure. They picked May 1 because they knew a price rise would not be effective if the majors did not raise their prices, and they knew the majors would not do so without first giving their dealers an opportunity to fill their tanks at the prevailing low price.

Lee returned to his office on a Friday morning. This was the day following the Wabash dealers' meeting and the dealers' protest meeting. He found on his desk a recommendation that Standard's tank wagon price to dealers in Goshen and Elkhart, Indiana, be lowered three or four cents because of the adverse effect on dealers in those cities due to the South Bend price war.

Later that same morning, Johnson informed Lee of Central West's decision to increase its price. He did not tell Lee that any other company had been notified. Lee made no statement as to what Standard would do. In fact, he testified that at that time he did not know what, if anything, Standard would do.

On the afternoon of Friday, April 26, Lee and Troup decided Standard should raise its suggested price to 31.9, and its tank wagon price to 26.4, and that the increase should become effective on May 1. The choice of 31.9 for regular came from their experience in March and early April when the independents would not go over 29.9, and by the knowledge that Standard dealers could not, in most cases, be competitive with a price which was more than two cents above the price of the independents.

Another reason for the selection of May 1st was that it would take at least two days to fill the tanks of the dealers, and Standard trucks did not make de-

liveries on Saturday or Sunday. Hence, May 1st was the earliest feasible date, and in addition, it was also a natural accounting cutoff.

The trial below was typical of what has been referred to as a mass antitrust conspiracy trial. Inherent in the conduct of such a trial are many difficulties. Not only were there thirteen defendants in differing situations, but there also were over two hundred alleged co-conspirators, sixty-five witnesses, and a trial extending over a seven-week period. Also inherent in such a trial is that a single defendant encounters what the Supreme Court in the Kotteakos case, Kotteakos v. United States, 328 U.S. 750, 774, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557, described as "The dangers of transference of guilt." The Second Circuit, in United States of America v. Bufalino, 285 F.2d 408, 417, called it the substitution of "a feeling of collective culpability for a finding of individual guilt."

Defendants assert many errors. Some of the claims of error must be sustained. We shall first consider exclusions of defense testimony.

■ It should be kept in mind that the case at bar is a criminal case. The defendants are corporations. At the trial, the defendants could deny the charge of an unlawful agreement or understanding only through the testimony of their employees who were supposed to have entered the agreement charged. It is difficult to conceive any right more important to one charged with committing a crime than of expressly denying the commission thereof in front of the twelve members of the jury.

The trial court refused to permit employees of defendants to answer questions such as:

"Did you make any agreement of any kind with Mr. Olmstead with reference to talking to your dealers about increasing their retail price?"

"Did you make any agreement of any kind with McClarnon as to what Texaco would do?"

"Did you have any understanding with Mr. Olmstead that you would ask your dealers to increase their retail price?"

"Did you have any understanding with McClarnon that you would ask Texaco dealers to raise their prices?"

"Did you make any promise or commitment of any kind to anyone as to what action Ohio Oil Company would take or which you would recommend that the Ohio Oil Company would take with reference to any price move at that time?"

"At any time during that luncheon, Mr. Weston, did Mr. Troup ask you to agree to raise the Shell prices?"

"At any time during that luncheon did you tell Mr. Troup or Mr. Johnson, or both of them, that if they would increase their prices you would increase Shell's prices?"

The trial court refused to permit the witnesses to answer these questions and also many others of a similar nature. The asserted reason for such ruling was that the denial by a witness that he had agreed to raise prices, or ask dealers to raise their prices, would constitute an "invasion of the province of the jury."

We think this reason was not valid as the jury would not be bound by the answer of the witness. As Wigmore puts it: such reason is "a mere bit of empty rhetoric" and that " * * * no legal power, not even the judge's order, can compel them [the jury] to accept the witness's opinion against their own." 7 Wigmore on Evidence, § 1920 (3rd Ed. 1940)

In Linden v. United States, 4 Cir., 254 F.2d 560, 566, the court rejected the notion that a witness could possibly usurp the jury's function by answering a relevant question, commenting: "[B]ecause 'the modern tendency in the law of evidence is to give the triers of the facts all the light they can have.' "

The words "agreement", "permission", "understanding", "assurance" have well-

established lay meanings. Various employees of defendants who had been shown by the government to have had some contact, telephonic or personal, with another defendant, were asked the question whether they had made any agreement or had any understanding about prices, etc.

The objections to such questions were uniformly sustained because of the trial court's ironclad rule as herein before stated, or because, as the court said, such questions called for a conclusion of the witness.

■ It is our understanding that witnesses in antitrust cases have uniformly been permitted to testify concerning the existence of agreements and understandings. In numerous court opinions, references are made to such testimony without any suggestion that questions as to agreements and understandings were objectionable. To illustrate, in Continental Baking Company v. United States, 6 Cir., 281 F.2d 137, 143, the court said: " * * * Of singular importance in his testimony was the following statement, made under cross-examination: 'Q. Now, actually was there any agreement, Mr. Hartzog? A. No, Sir.' "

Among the many court opinions which cited and quoted similar questions are: Cole v. Hughes Tool Company, 10 Cir., 215 F.2d 924, 940; Milgram v. Loew's Inc., 3 Cir., 192 F.2d 579, 582; Dipson Theatres, Inc. v. Buffalo Theatres, Inc., W.D.N.Y., 86 F.Supp. 716, 727, affirmed 2 Cir., 190 F.2d 951; United States v. Griffith Amusement Co., W.D.Okl., 68 F.Supp. 180, 196. The government has failed to cite a single case where objections to such questions were upheld.

Indeed, in an antitrust case, the United State Supreme Court held that an inference unfavorable to a defendant corporation arises from failure to "tender the testimony, at their command, of any officer or agent of a distributor [defendant] who knew, or was in a position to know, whether in fact an agreement had been reached among them for concerted action." Interstate Circuit, Inc. v. United States, 306 U.S. 208, 225, 59 S.Ct. 467, 473, 83 L.Ed. 610.

We think it clear that the trial court's refusal to permit express denials of any agreement or understanding by the very employees of the defendants who were supposed to have entered into such agreements or understandings, was erroneous.

■■ The substantive law of trade conspiracies requires some consciousness of commitment to a common scheme. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., et al., 346 U.S. 537, 540–541, 74 S.Ct. 257, 98 L.Ed. 273. It has been stated there is no such thing as an "unwitting conspirator." United States v. National Malleable & Steel Castings Co., N.D.Ohio, 1957 C C H Trade Cases Par. 68890, at page 73601. Unless the individuals involved understood from something that was said or done that they were, in fact, committed to raise prices, there was no violation of the Sherman Act.

It is the fact of commitment which is really at issue. This, in turn, involves the understanding of the parties. The alleged conspirators should be permitted to deny that such an agreement or understanding was, in fact, ever reached.

"The criminal quality of a common design of two or more persons rests in the intention of the parties to the agreement, construed in connection with the purpose accomplished. It follows, therefore, that the criminal intent may be denied * * *" 11 Am.Jur., Conspiracy, § 39.

Hartman v. United States, 8 Cir., 215 F.2d 386, 394, is pertinent. A charge of income tax evasion was there involved. The defendant had been precluded from testifying that he had relied upon his auditor. The court said: "This court and others have consistently held that where the intent of the accused is in issue, he may testify as to what his intent was * * *. It is argued that it might be inferred from other parts of the record that defendant was claiming that he had relied on the accountant. But it was his right to have his direct and positive

oath to that effect received in evidence and considered by the jury."

It is understandable that in the instant case, the defendants believed there was the utmost need for express denials of agreements, understandings, promises and assurances because the government's Bill of Particulars charged the agreement was "partly express and partly implied." And, insofar as express, "partly oral and partly written."

The trial court admitted telephone toll slips as evidence of conspiratorial contact between defendants without any showing of conspiratorial content of such calls. This ruling must have been based on the theory that some kind of an agreement, express or implied, had been reached or broached in such conversations.

All of the defendants complain of the trial court's rulings restricting defense cross-examination of government's witness Rice, and thereafter refusing to permit a specific denial of Rice's accusations of inter-defendant "assurances" by the man from whom Rice claimed to have learned them, a Standard employee named McClarnon.

Until June 1956, Rice had been McClarnon's superior in the local Standard organization at which time, due to what has been referred to as "a very delicate matter", Rice was suddenly demoted and was placed under McClarnon. It was then suggested that Rice seek other connections, and in June 1957, he resigned from Standard's employ.

Three years later, on the eve of the trial, Rice first brought forth his charges of inter-defendant "assurances" in connection with the May 1st price rise. At the trial, Rice testified that on the night of April 29, 1957, McClarnon informed him by telephone that he had "assurances" that most of the major oil companies in the South Bend area were going to increase their prices.

Defendants, of course, were entitled to a fair opportunity to cross-examine Rice. It was apparent Rice might well entertain hostile feelings toward Standard and McClarnon. The defendants argue that they had no such opportunity here because the court "protectively erected barrier after barrier to the effective cross-examination of Rice."

Many instances of alleged unfair restrictions of cross-examination of witness Rice are cited by defendants. Perhaps the two principal errors asserted are 1) refusal of the trial court to permit a foundation to be laid for Rice's impeachment by a prior inconsistent omission in his story, and 2) refusal of the court to permit defense counsel to examine Rice about his preparation for trial by government counsel.

Rice had been interviewed by government counsel twice; once in October 1960 and again, the day before he testified at the trial. It developed that government counsel had taken notes at the first interview with Rice, and defense counsel then moved for the production of such notes under the provision of the Jencks Act, 18 U.S.C. § 3500. Government counsel represented to the court "we did not show them to the witness." Rice thereafter admitted under oath "I was shown the notes or whatever they might be called yesterday." It was then, for the first time, that government counsel explained to the court that he had made a distinction between the original notes of counsel and the typed version thereof which had been dictated after the interview. As Rice had read the typed version, two of the three pages were made available to defense counsel. However, the court continued to sustain general objections on what transpired between Rice and government counsel during the interview on the eve of the trial. This occurred many times without government counsel indicating any grounds for his objection. The record repeatedly shows "Mr. Jinkinson: 'Objection'. The Court: 'Sustained.'"

Defendants' counsel prepared the following impeaching question to be asked Rice: "Mr. Rice, isn't it true that on October 31, 1960, in your office at Elkhart when you were interviewed by Mr. Kuhlmey and Mr. Tell you were asked by them that you tell them your entire recol-

lection of your telephone conversation with Mr. McClarnon on April 29, 1957, and that you did not mention to them anything about assurances from Texaco, Sinclair, Shell, Socony Mobil, Ohio, or any other company?"

The trial court refused to permit defense counsel to ask this question of Rice. For want of an answer defense counsel were precluded from subsequently impeaching Rice.

■■ We hold the trial court unduly restricted the cross-examination of witness Rice. Also, the court should have permitted the impeaching question to be asked. The fact that the question included so-called negative evidence should not have barred the impeaching question. Pertinent is a statement by Professor Wigmore: "A *failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact. This is conceded as a general principle of Evidence. * * *" 3 Wigmore on Evidence § 1042 (3rd Ed. 1940), p. 733.

We think that many of the questions asked to which objections were sustained, were proper cross-examination. Defendants' counsel were entitled to explore the possibility that the testimony of witness Rice may have been in some way influenced by suggestions or statements made by those who interviewed him. The foreclosure of cross-examination into the credit to be given "Rice's second-hand conspiracy charges" [2] was error.

When McClarnon testified, an unusual situation arose. He testified he had no recollection of any conversation with Rice on April 29th. He did testify that between April 26 and April 30, he had no information about what any oil company other than Standard proposed or intended to do with respect to changing its gasoline prices. When he was asked if he had told Rice what the latter testified he had said on April 29, the court would not permit a specific denial of Rice's charge. The court reasoned that if McClarnon could not remember having had a conversation, he couldn't say that he didn't say some specific thing in that conversation.

■ We hold that in view of the fact McClarnon did testify that between April 26 and April 30 he had no information as to what any oil company other than Standard proposed to do, there was no prejudicial error in this ruling. However, on the broader question we hold the trial court erred in refusing to permit a specific denial by McClarnon that he had ever made a statement to Rice with reference to the various oil companies as related by Rice in his testimony. The jury was entitled to pass on McClarnon's credibility in this respect.

■ We comment only briefly on claims by all defendants that they were erroneously restricted in their cross-examination of witnesses on the issue of dealer inducement. We think the trial court's refusal to permit adequate cross-examination by defendants' counsel as to their reasons for raising their prices on May 1st was error.

Many of the dealer witnesses called by the government belonged to the Dealers' Association which had demonstrated its great hostility to the oil companies. The meeting called by this Association on April 25th was specifically intended as a price-fixing meeting. Naturally the oil companies could not and did not participate in the meeting. On April 30, the Dealers' Association wrote a letter castigating the oil companies for their non-attendance. We hold the defendants were entitled to adequately inquire into the decisional thinking of each dealer witness when he raised his price on May 1st.

### THE JOHN MYER INCIDENT

All of the defendants generally, and the Ohio Oil Company in particular, contend that they were greatly prejudiced by the trial court's conduct with reference to the witness John Myer.

Myer had been an independent Ohio dealer during the April 1957 price war. He had severed his relationship with

2. The quotation is taken from brief of defendants' counsel.

Ohio in April or May 1958. At the time of his testimony he was engaged as a carpenter and had no connection with Ohio.

Myer was called as a government witness on the 20th day of the trial. At that point, the evidence in the record showed Myer, as well as other Ohio dealers, was told of the price increase at the Ohio company stations on May 1st. Myer had testified before the Grand Jury in October 1958. It was soon apparent that government's counsel wanted to establish that a conversation between Nicholas, the Ohio clerk, and Myer took place on April 30, 1957, apparently so the argument could be made that Ohio, at that time, was not waiting for the results of a price check to be made on May 1st. The government could then argue that Ohio must have had an agreement or understanding with others before that date to increase its price on May 1st. On the other hand, Ohio's position was that it did not know on April 30 when or if the price at the company-operated stations would be changed May 1st. Ohio claimed that after the surveys were made on May 1st, and showed prices to be up generally, it then notified its dealers of its decision to raise prices and that this occurred late in the morning of May 1st.

When Myer testified before the Grand Jury he stated with reference to when Nicholas mentioned company-operated stations to him, that "I forget what day it was." However, when government counsel suggested the date was April 30th, Myer apparently accepted it, at least, temporarily.

Other statements by Myer in his Grand Jury testimony, both before and after his apparent acceptance of the April 30th date, indicate that there were two conversations with Nicholas. It could well be that his first statement referred to a May 1st conversation, and the second statement to an April 30th conversation.

When Myer testified before the Grand Jury, he had been out of the business for more than a year. Apparently he had given the date about which he was questioned, little or no thought for eighteen months. Quite likely he saw no significance in the date.

In their interview with Myer before putting him on the stand, government counsel told him he had told the Grand Jury that April 30 was the date, and insisted that he so testify at the trial or else " * * * they would bring the Grand Jury testimony in the courtroom, * * * the jury would have to leave the room and * * * the judge would read me my Grand Jury statement and ask me if it would recollect or refresh my memory." However, Myer did tell government counsel that he hadn't known the correct date when he went before the Grand Jury, and didn't know it then and couldn't swear the conversation took place on April 30.

Mr. Myer went to the so-called witness room. Mr. Scanlon, counsel for Ohio, approached Myer and asked him what his testimony would be. There was nothing secret about the interview. The trial judge and government counsel observed Mr. Scanlon talking to Myer. Later, government counsel again interviewed Myer and Mr. Scanlon talked to him a second time. The second interview was also in plain view of government counsel.

At the first interview with Mr. Scanlon, Myer stated he wasn't sure of the dates of the conversations and that he had so informed government counsel. Mr. Scanlon told Myer that the date was important and he should tell the truth.

When the government called Myer to the witness stand, he testified just as he had told government counsel he would—that he could not recall Nicholas saying anything about the company stations on April 30. Government counsel then requested, in accordance with the practice previously established by the trial judge, that the jury be excused so that the witness's memory could be refreshed with his Grand Jury testimony.

Government counsel apparently marked and asked the trial judge to read to Myer only that part of Myer's Grand

Jury testimony in which he acquiesced in the April 30th date.

At that point, only government counsel and the trial judge had read any part of the Myer testimony. Ohio's counsel suggested to the court that although he had not seen the transcript, he was certain it would show that Myer was led into the statement as to the April 30th date, and asked the court to observe whether or not this witness suggested any other date.

The trial judge, after examining the transcript, commenced his reading with the question that had been marked by the government, in which the April 30th date was suggested. In doing so, there was not read to Myer "I forget what day it was" which was in the immediately preceding answer.

After reading to Myer the portion of his testimony hereinbefore indicated, the trial judge asked whether it refreshed his recollection. Myer then explained to the trial judge that he had two conversations with Nicholas, one on April 30th and one on May 1st, and he was not sure on which occasion Nicholas had told him about the company stations but that "the only thing which sticks in my mind is the fact that that part was said on the 1st, about the company stations."

When Ohio's counsel sought to elaborate on the earlier statement, the trial judge accused Ohio's counsel of "an attempt to get the witness to deviate from his sworn testimony before a Grand Jury."

Before recessing for the day, the trial judge sternly instructed Myer at request of government counsel, "not to discuss your testimony with anybody at all or discuss it with any counsel or any party to this lawsuit until you come back here tomorrow at 9:30."

Myer's testimony was resumed the next morning but not until the trial judge had first asked (out of the presence of the jury) whether he had obeyed the trial court's instructions of the evening before.

Although Myer had testified before the jury in detail as to his April 30th conversation with Nicholas, government counsel was permitted again to cover the same ground in great detail. Once more government counsel and the court closely questioned Myer. Once more Myer testified he could not say that Nicholas, on April 30, had said anything about prices at company stations.

Apparently the ground on which government counsel was permitted a second and lengthy harassing examination of Myer was to impeach the witness. Myer had been very cooperative with the government; he had not been connected with Ohio for some period of time; his testimony should not have been a surprise to government counsel. He testified at least ten times that he could not fix the date of the important conversation with Nicholas as being April 30th.

Government counsel were next permitted to engage in attack on Mr. Scanlon, counsel for Ohio, by means of cross-examination of Myer, the government's witness. The cross-examination was with reference to conversations between Myer and Attorney Scanlon before Myer took the stand. The evident purpose of the cross-examination was to imply to the jury that Myer had changed his testimony and that Mr. Scanlon was responsible for that change.

We have read the complete record pertaining to the Myer incident. This opinion is already of such length that further detailed statements on this point cannot be set forth. However, the numerous questions of the trial judge indicated strongly to the jury that he did not believe Myer was telling the truth. Furthermore, Mr. Scanlon was rigidly restricted in the questions that he was permitted to ask.

After Myer and the jury had been excused, Ohio moved for a mistrial. The Court said: "The motion is denied. This is the first time in my experience where I have ever heard defense counsel talking after a witness has been subpoenaed by the Government twice with regard to his testimony. It may have been done

but I never experienced it in my seventeen years on the bench."

■ We think the attack on Mr. Scanlon was unwarranted and unfortunate. His conversation with Myer was in full view of the trial judge and counsel; nothing that was said by Mr. Scanlon was improper. We hold the attack made on Mr. Scanlon and Mr. Myer was unwarranted and that it was prejudicial to Ohio; that it, in fact, contributed to the air of hostility toward all of the defendants which had been engendered at the trial. This condition was one of a number which prevented the defendants from having a fair trial.

The court did instruct the jury that Myer's Grand Jury testimony should not be considered by them as substantive evidence but only as affecting his credibility. We think this instruction was entirely inadequate to correct the prejudicial error committed. It gave no explanation of why the government had been permitted to attack Myer so vigorously and continuously; it did nothing to erase from the jury's mind the attack by government counsel on Mr. Scanlon.

■ All of the defendants strongly urge that the trial below was unfair "because the trial court took sides." They say that "a well-intentioned one-sidedness is no less one-sided."

A similar situation was recently presented to us in United States of America v. Fry (1962), 7 Cir., 304 F.2d 296, 298. We there said "The judge conducting a jury trial in a federal court is more than a 'mere moderator'; he is 'the governor of the trial for the purpose of assuring its proper conduct.' * * * He has the prerogative, and at times the duty, of eliciting facts he deems necessary to the clear presentation of the issues. To this end he may examine witnesses who testify and even call witnesses on his own motion. * * *

"In eliciting facts, however, and in attempting to expedite the trial in the aid of truth and furtherance of justice, the judge must be careful to preserve an attitude of impartiality and to guard against giving the jury an impression that the court believes the defendant is guilty. * * * *"

In Fry, page 298, we also pointed out that a defendant is entitled to the presumption of innocence by both the judge and the jury until his guilt is proved. " 'If the jury is inadvertently led to believe that the judge does not regard the presumption, they may also disregard it.' "

In Fry, we pointed out the trial judge asked 1210 questions of the witnesses. In the case at bar, the defendants assert the trial judge asked 596 questions of which 468 were useful to the government,[3] in contrast to 81 useful to the defense; that in 33 instances, the trial court volunteered an objection or voluntarily struck defense testimony as compared with one such action in the case of the government's testimony.

Quoting further from Fry, page 298, "In the instant case we believe the trial judge departed from this attitude of disinterestedness in such a manner as to deprive defendant of a fair trial. We come to this conclusion reluctantly because of our conviction that this departure was not intentionally pursued by the able trial judge who has earned the high regard of both his brother judges and the bar for his fairness and impartiality."

The foregoing quotation from Fry is appropriate and pertinent to the situation in the case at bar. Here, the able trial judge had wide experience in the trial of cases in the federal system. He was and is highly regarded by the bench and bar. There can be no basis for a suggestion the trial judge was intentionally partial to the government's cause. However, the strain of conducting a complicated trial over a period of many weeks is an exhausting experience. A careful examination of the long record in the instant case forces us to the conclusion that defendants did not receive

---

3. The Government disputes the classification.

a fair trial. There were many, many instances which may very well have led the jury to believe that the trial judge regarded the defendants as guilty of the offense charged, and that the verdict of the jury should be to that effect. We conclude the defendants did not have a fair trial.

The cumulative effect of the errors which we have hereinbefore described is that all of the defendants are entitled, at least, to a new trial.

### Claimed Erroneous Instructions to the Jury.

 All of the defendant-appellants earnestly and vigorously contend .that various instructions given by the court were prejudicially erroneous. We shall not discuss these objections in detail. Another judge will hear the new trial and will prepare his own instructions.

All defendants seem to agree that the instructions as given, told the jury that any defendant which took any action of its own after hearing of Standard's announcement, was automatically guilty of conspiracy. If such is a correct interpretation of the trial judge's charge, it would be erroneous. The "invitation" referred to in Interstate Circuit, Inc. v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610, was a solicitation to act in concert. Certainly, any defendant which heard of Standard's price announcement was not thereby immobilized and precluded from acting in a normal fashion as its interests might dictate so long as it was not pursuant to an understanding or agreement.

### Jury Was Given Copy of Court's Instructions.

One or more of the defendant-appellants contend it was error to give the jury a copy of the court's instructions. The copy which was in the hands of the jury shows that some person or persons made numerous markings and interlineations thereon. At one place, the word "Phillips" had been inserted in ink. In the absence of a showing to the contrary, we presume these markings were made by one or more members of the jury.

 We hold it was not error for the trial judge to hand the jury a copy of his instructions. Copeland v. United States, 80 U.S.App.D.C. 308, 152 F.2d 769. The delivery of the instructions to the jury in the instant case required more than an hour. As litigation grows increasingly complex, the jury often may be helped in their deliberations by having a copy of the instructions before them rather than sending word to the court asking that the instructions on a certain point be repeated. The trial judge has wide discretion as to whether he will submit a copy of his instructions to the jury. Here, there was no abuse of discretion.

### Court's Direction to Jury to Take Notes.

After the prospective jurors had been examined on *voir dire,* and after the jury had been empaneled, and after the conclusion of the opening statements, the trial judge announced for the first time that he intended to give each of the jurors a notebook with the juror's name thereon for use in "making notes as the case goes ahead." Objections thereto by defendants were overruled.

If defendants' counsel had known prior to the *voir dire* that the trial judge intended to initiate note-taking by the jury, they could have examined the prospective jurors concerning their note-taking ability. Several of the women jurors had worked in offices; it later developed that juror Mary Evans was an expert stenographer. Several of the women jurors apparently kept copious notes. At least one or two of the other jurors kept no notes whatsoever.

 We think it is within the sound discretion of the trial judge to permit one or more jurors to take notes if they so request. However, it is a doubtful practice to permit, much less insist, that an entire jury take notes. Such practice might well be confusing and disturbing to certain jurors who would have no aptitude for note-taking. Such a juror might be writing an answer in longhand

during which period several additional questions might be propounded and answers made. Furthermore, if one or more of the jurors who were proficient in shorthand had taken shorthand notes which none of the other jurors could read, the views and arguments of such a juror might well take on undue importance.

We know of no case where an appellate court has approved the practice of note-taking by jurors at the suggestion of the trial judge. The Supreme Court of Ohio has disapproved the practice. In Corbin v. City of Cleveland, 144 Ohio St. 32, 56 N.E.2d 214, 154 A.L.R. 874, the court held that such note-taking was reversible error although the Corbin case involved a civil matter.

 The practice of compulsory note-taking which was followed in the case at bar, should not be encouraged. If any trial judge insists on such a practice, the court, as a very minimum, should, prior to the *voir dire*, notify counsel of its intent to direct the jury to take notes. Counsel should then be permitted full latitude to examine the prospective jurors as to their note-taking ability. In any such case, the notebooks should be impounded, as was done in the case at bar, and made a part of the record on appeal where counsel for either party has promptly registered objection to compulsory note-taking by the jury.

Under the circumstances of this case, we do not hold that note-taking at the suggestion of the court was reversible error in itself. However, we can visualize under certain conditions the practice of compulsory note-taking, over the objections of one or more parties to the suit, might well be the basis for reversible error.

GOVERNMENT'S USE OF SUBPOENAES TO COMPEL WITNESSES' APPEARANCE FOR PRIVATE INTERVIEWS.

Before the opening statements by counsel, the court's attention was directed to the fact that the government was issuing subpoenaes to compel witnesses, many of them employees of defendants,

to come, not to the courtroom, but to the United States Attorney's office at hours when the court was not in session. Having been summoned by court process, these witnesses were privately interrogated by government counsel. When one of the witnesses asked to have present, counsel for the defendant by whom he was employed, that right was denied to him by government counsel.

 Rule 17(a), Federal Rules of Criminal Procedure, indicates the subpoena is to be used to compel attendance of a witness at the trial. The rule states: "It * * * shall command each person to whom it is directed to attend and give testimony at the time and place specified therein." The language of the rule is somewhat ambiguous. However, we interpret the words "to attend and give testimony" to mean "to give testimony at the trial." The rule does not authorize the government or the defense to subpoena a witness and require him to report at some place other than where the trial is to be held. Of course, as hereinbefore suggested with reference to witness Myer, there is no impropriety for counsel on either side to interview a witness if done fairly and without attempting duress in any form.

 We think the witness was entitled to have the attorney whom he designated, accompany him. Of course, such attorney should not be permitted to interfere with the progress of the interview. He should, however, if the occasion arose, have been permitted to advise the witness as to his constitutional rights. The refusal in the case at bar did not constitute error, as it was the witness and not a defendant who was deprived of a right or privilege.

MOTIONS FOR JUDGMENTS OF ACQUITTAL.

All of the defendants entered timely motions for acquittal. All such motions made by each of the appellants herein were denied. All these defendants now strongly urge there is insufficient evidence in the record upon which a finding of guilty could properly be based. They

also argue that as a matter of law, they are entitled to judgments of acquittal.

In considering the sufficiency of the evidence, we must, of course, take the view of the evidence most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. As to the law involved, we must keep in mind that a conspiracy which operates upon the flow of commodities in interstate commerce is within the ambit of the Sherman Act. United States of America v. Gasoline Retailers Association, Inc., et al., 7 Cir., 285 F.2d 688, 691.

The four independent companies (Central West, Tornado, Hudson and Pacer) purchased gasoline from various refiners and resold the product through company-operated stations. Hudson and Tornado had only one station each in the South Bend market.

The distribution system of the majors varied. Some, such as Standard, Ohio and Cities Service, had company-owned stations and sold also to dealers, the majority of whom leased the premises and facilities from the company. Shell had dealer outlets and also a consignment or "C" station to which its product was delivered on a consignment basis. Texaco and Socony sold only through dealer outlets having neither company-owned stations nor "C" stations. Phillips was the only major selling in the South Bend market through jobbers who, in turn, resold to dealer outlets.

The theory of the government's case was that Standard and Central West agreed upon a price increase and then telephoned their competitors for the purpose of obtaining their concurrence; that the other appellants, upon receiving the phone calls, accepted the invitations thus issued and induced their independent retail outlets or ordered their controlled retail outlets to raise prices in accord with the telephonic invitations.

We have carefully considered the arguments of each defendant as to why the indictment should have been dismissed as to it, and as to why a judgment of acquittal should have been entered. The case of each appellant has been given separate consideration. A close question is presented in each case, but we shall discuss separately only the appeal of Phillips Petroleum Company.

### PHILLIPS PETROLEUM COMPANY.

The business of Phillips is unique among the marketers of gasoline in the South Bend area. Phillips was the only defendant-appellant who merely sold gasoline to independent jobbers and did not operate any gasoline bulk plant or retail service stations in that area.[4] Phillips sold gasoline in wholesale lots at the pipeline terminal of Phillips Pipe Line Company located at East Chicago, Indiana. It delivered gasoline free-on-board trucks owned and operated by three independent business concerns called jobbers. These jobbers transported such gasoline in their own trucks to service station dealers in that market area.

The only charge against Phillips in the indictment is that Phillips agreed to "induce" the jobbers to "persuade" their dealers to increase the retail or pump price of gasoline. The so-called Standard routine on which the government places much emphasis, whereby Standard called competitors and told of its planned price increases, does not apply. No one from Standard phoned Phillips. Phillips had no office or place of business in the market area with which we are here concerned. Phillips did employ a salesman named William Oliver who called on jobber customers in portions of four counties in northern Indiana.

Oliver had been absent from the South Bend area for the entire period from Saturday, April 20, 1957, to Sunday night, April 28, 1957. On Monday morning, while calling on two of the jobber customers, he first heard rumors that Standard had decided to increase its tank wagon price on May 1, 1957. After lunch

---

4. Texaco and Socony sold gasoline directly to independent dealers but did not operate any retail service stations in the market area.

on Monday, April 29, Oliver, without consulting any of his superiors, called Standard's office in South Bend and asked if the rumors were true. Mr. Troup of Standard verified that Standard would increase its prices on May 1st. Oliver did tell three jobbers what he had learned but made no suggestions as to prices or price signs.

The record before us does not show that Phillips made any agreement with anybody. Standard did not call Phillips. Standard did not ask for any action by Phillips. Oliver, who had no pricing authority, did not agree to anything. There is no evidence that Phillips induced or persuaded any jobber to induce or persuade any dealer to raise prices. Phillips, and no employee of Phillips, had any knowledge of any alleged "plan." All actions by Phillips were entirely consistent with its innocence. The government failed to produce sufficient circumstantial evidence to "exclude every reasonable hypothesis except that of guilt." United States v. Fenwick, 7 Cir., 177 F.2d 488, 490. We hold the judgment of conviction against Phillips must be set aside with instructions to dismiss the indictment as to it.

The motions of the other defendants for dismissals of the charges against them are denied.

Various of the defendants have raised other issues not hereinbefore discussed. In view of our disposition of these appeals, we have refrained from comment thereon. The fact that we have not specifically discussed same is not to be taken as either approval or disapproval of the questions raised. All we have decided is that, assuming we agree with the arguments of appellants in respect thereto, we do not consider them as establishing prejudicial error *per se*.

The judgment of conviction as to Phillips Petroleum Company is reversed with directions to dismiss the indictment as to it. The judgments of conviction as to Standard Oil Company, Socony Mobil Oil Company, The Ohio Oil Company, Cities Service Petroleum Company, Texaco Inc., Shell Oil Company, Central West Oil Company, Tornado Oil Company, Inc., Hudson Oil Company of Illinois, Inc. and Pacer Oil Company are reversed and remanded for a new trial.

Reversed.