(No. 42064.—

The People of the State of Illinois, Appellee, *vs.* William A. Eubank, Appellant.

*Opinion filed September 29, 1970.*

Schaefer, J., took no part.

Thomas P. Sullivan, Jon G. March, and Douglas C. Nohlgren, all of Chicago, (Jenner & Block, of counsel,) for appellant.

William J. Scott, Attorney General, of Springfield, and Edward V. Hanrahan, State's Attorney, of Chicago, (James B. Zagel, Assistant Attorney General, and Elmer C. Kissane and James S. Veldman, Assistant State's Attorneys, of counsel,) for the People.

Mr. Justice Culbertson delivered the opinion of the court:

Defendant, William A. Eubank, was convicted of the offense of armed robbery (Ill. Rev. Stat. 1965, ch. 38, par. 18—2) after a bench trial in the circuit court of Cook County and sentenced to imprisonment in the penitentiary for a term of not less than 10 nor more than 15 years. He appeals directly to this court, contending that certain of his constitutional rights were violated prior to and during the course of the proceedings which resulted in his conviction. See our Rule 302, 43 Ill.2d R. 302.

During the trial, Mrs. Yolanda Kuba, the victim of the robbery charged as having been committed by defendant, testified that at about 1:15 P.M. on December 21, 1966, a person ostensibly dressed as a telephone company service-man came to her home at 9116 South Komensky in Oak Lawn, Illinois. Present at the home were Mrs. Kuba and her mother, one Mrs. Lewis, age 72 at the time in question. The caller told Mrs. Kuba that he was from the telephone company and that it would be necessary for him to discon-nect her telephone for a period of about 20 minutes. After gaining entrance, the person went to the basement of the Kuba home, and Mrs. Lewis went downstairs after him so as to give him any needed assistance concerning the loca-tion of the telephone equipment. Thereupon Mrs. Kuba re-turned to her kitchen where she was in the process of pre-paring *hors d'oeuvres* for a party scheduled that evening in her home. Moments later she noticed the purported serv-iceman in front of her. The man, identified at the trial by Mrs. Kuba as the defendant, brandished a gun, advised Mrs. Kuba that she was being "held up" and that he wanted all her diamonds or jewelry. He nudged Mrs. Kuba with the gun and directed her to the master bedroom. During this time, he admonished Mrs. Kuba to hold her face down, but she nonetheless continued to stare at him. He obtained Mrs. Kuba's jewel box, which apparently contained diamonds and other jewelry. He also gained possession of some of Mrs. Kuba's money and her furs. After accomplishing the foregoing, he told Mrs. Kuba to go into a closet and remain there for at least 10 minutes, which she did. The robber had apparently earlier locked Mrs. Lewis in the basement. The robbery, from its inception to its completion, took about 15 minutes.

Mrs. Kuba called the police upon emerging from the closet and gave the officers, when they arrived at the scene, a detailed description of the robber. Early in January, 1967, Mrs. Kuba identified a photograph from among 67 photo-

graphs shown her by the police, as a photo of the robber. Mrs. Kuba further testified that on July 27, 1967, she had occasion to again observe the man who had robbed her, this time at the Federal Court Building in Chicago. She had been contacted by Captain Kenneth O'Brien of the Oak Lawn Police Department, whereupon she went to the Federal Court Building. She walked into a particular courtroom pursuant to the direction of the officer and saw the person who had robbed her. This person was identified as the defendant. Mrs. Kuba saw the defendant again on July 31, 1967, three days after the date of defendant's arrest, when he came to her home and protested his innocence, advising her that she had mistakenly identified him as the perpetrator of a robbery in her home.

Captain O'Brien corroborated Mrs. Kuba's photographic identification and also her July 27, 1967, identification of the defendant in the Federal Court Building.

For the defense, Adolph Lewin testified that he was a jewelry manufacturer, that defendant had been his firm's employee on December 21, 1966, and that between the hours of 1:00 and 1:30 P.M. defendant had been in the firm offices located at 5 N. Wabash in Chicago. On cross-examination it was shown that Lewin had been out of the offices for lunch from about noon to 1:00 P.M. on the day in question. Further, Lewin "presumed" that defendant had also gone to lunch that day, although he didn't specifically recall seeing him leave. Lewin admitted that defendant could have left the store at times during the day for a few minutes, but doubted that he could have been gone for a greater period of time. Lewin also testified on cross-examination that his firm's sales invoices for the month of December, 1966, copies of which he brought with him to court, were numbered consecutively, in the chronological order of sales which had occurred, from No. 16355 through and including No. 16784; that the first invoice for December 21, 1966, was numbered P16665 and referred to a sale

by defendant of a bracelet to C. Silvani. The number on this invoice was handwritten, and the witness testified that blank invoice forms were readily accessible at all times to his salesmen. Ordinarily, sales made to corporations were recorded on invoice forms having printed numbers thereon, while sales to individuals were recorded on slips bearing handwritten numbers. Sales to individuals were further identified by the appearance of a "P" immediately before the number on the sales slips. However, Lewin identified several sales slips made out by defendant for sales to individuals which did not bear the letter "P". Lewin further indicated that he presumed that a volume of business had occurred in the forenoon of December 21, 1966, during which period he was present at the store, leaving the clear inference that the recorded sale to C. Silvani, if made at or about the time of the robbery, could not have been the first sale of the day, as indicated by Lewin's records. Lewin, who was acquainted with Carl Silvani, did not see the latter in his store on the day in question.

The foregoing constitutes a summary of all of the evidence adduced at the trial.

Defendant initially maintains that it was error of constitutional magnitude to allow the introduction of Mrs. Kuba's Federal Court Building identification of defendant as the robber. It is argued that defendant was entitled to the presence of counsel at this pretrial confrontation under the mandate of the United States Supreme Court's decisions in *United States* v. *Wade,* 388 U.S. 281, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert* v. *California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951. The question, under *Stovall* v. *Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, is whether, under all the facts and circumstances the July 27, 1967, identification of defendant by Mrs. Kuba was accomplished through procedures so fundamentally unfair as to deprive defendant of his constitutional rights. In this regard it must be shown by defend-

ant that the identification procedure employed was so conducive to misidentification as to deprive him of due process of law. (*People* v. *Nelson,* 40 Ill.2d 146, 150; see also *People* v. *McMath,* 45 Ill.2d 33.) We do not believe that such is the case here. In the first place, defendant had not yet been arrested when the identification took place, and as we observed in *Cesarz,* "It would be strange indeed to require counsel in a case such as this where defendant had not been placed under arrest and was unaware [at the outset] that he was being observed." (44 Ill.2d at page 184.) Secondly, and more importantly, we find nothing in the procedure here employed to be unduly suggestive to Mrs. Kuba. She observed defendant in a courtroom wherein proceedings were taking place wholly unrelated to the charge in question. She had earlier demonstrated her recollection of the physical characteristics of the robber and had indeed previously identified a photograph of the robber from among 67 photographs submitted to her by the police. There is nothing whatever in the record which implies that defendant was pointed out to her by the authorities as she made her identification at the Federal Court Building. Furthermore, she immediately recognized the defendant upon entering the Federal courtroom. Under all of the circumstances, we do not believe the trial court erred in admitting the evidence in question as corroborating Mrs. Kuba's in-court identification of the accused as the robber. (*People* v. *McMath,* 45 Ill.2d 33, 37.) In any event, however, defendant's privately retained trial counsel made no substantive objection to the admission of evidence relating to the July 27, 1967, identification, or indeed to any of the identification testimony, and all questions with regard thereto are, accordingly, waived. *Cf. People* v. *French,* 33 Ill.2d 146, 149.

Defendant next argues that his conviction must be reversed because of the State's alleged intimidation of a prospective defense witness. In this connection, attached to defendant's motion for a new trial is the affidavit of Carl Sil-

vani, which affidavit sets forth allegations which, if established, would clearly amount to coercion and intimidation of a prospective defense witness by the State. Thus, it is stated therein that Silvani was contacted by defendant sometime during the summer of 1967 with respect to Silvani's purchase of a gold bracelet from defendant on the date and at about the time the robbery took place. Silvani recalled the purchase, and, after he found among his records his receipt therefor, he went to the offices of defendant's trial counsel for a conference with defendant and his attorney with respect to the circumstances of the bracelet purchase. At that time defendant's attorney advised Silvani that defendant had been charged with armed robbery and that Silvani would be an alibi witness. Silvani's prospective testimony was again discussed with defendant's trial counsel at the latter's office on November 19, 1968, two days before the trial commenced. At that time Silvani was asked to hold himself available for the balance of the week so that he could testify on defendant's behalf. On November 20, 1968, Silvani was served with a subpoena requiring his appearance at defendant's trial that same day. (The trial in fact commenced on November 21, 1968.) When Silvani got to the courtroom indicated in the subpoena, he learned from Thomas Tully, the assistant State's Attorney assigned to prosecute the instant case, that he had in fact been subpoenaed by the prosecution. Silvani was questioned by Tully and Captain Maurice Higgins, the chief of the State's Attorney's police, with regard to his contemplated testimony. He signed a court reporter's statement setting forth that he had in fact purchased a gold bracelet from defendant at Adolph Lewin, Inc., located at 5 North Wabash in Chicago. He was in the store from about 12:45 to 1:20 P.M. on December 21, 1966. Tully and Higgins advised Silvani that they disbelieved his narrative, and Silvani was warned of the consequences of perjury. The affidavit further states that Higgins called Silvani a liar in angry, abusive language,

and that Tully advised Silvani that if he persisted in his story he would go to jail and lose his job at the Chicago Health Club. Silvani nonetheless maintained the truthfulness of his account of the bracelet purchase. However, in the face of the threat of incarceration and the loss of his job, Silvani advised Tully that he didn't want to testify on defendant's behalf. Tully then told Silvani that the State would want his testimony on the morning of November 21, 1968, and Silvani agreed to appear. After Silvani left Tully's office he called defendant's counsel and advised him he would not be a defense witness. On November 21, 1968, Silvani, pursuant to Tully's request, came to the courtroom where defendant's trial was in progress and remained available all day. That evening Silvani received at his home a phone call from Captain Higgins during which his wife, who answered the phone, was threatened. When Silvani came to the phone, he was berated for having left the courthouse without permission. Higgins told Silvani to come to Higgins's office immediately. Silvani thereupon went to the courtroom of defendant's trial to seek relief from the court. Upon finding the courtroom vacant, Silvani called defendant's counsel and was advised that he was not required to see Higgins, and that if he were afraid, he should come to defense counsel's office, which he did. Defense counsel thereupon placed a phone call to Tully, demanding cessation of the harrassment of his prospective witness. At defense counsel's request, Silvani appeared at the courtroom in question the next day, November 22, 1968, and remained throughout the day. He advised defense counsel, however, that under no circumstances would he take the stand as a defense witness. As we have seen, Silvani did not testify at the trial for either defendant or the prosecution.

At the hearing on defendant's motion for a new trial, Silvani testified and substantially corroborated the allegations set forth in his affidavit. The court also heard the testimony of Jack Stein, defendant's trial counsel, who re-

lated, over objection by the State, the substance of Silvani's conversations with him with regard to the State's alleged abuse and intimidation of Silvani. Stein further stated that Silvani refused to testify voluntarily on behalf of defendant and that, under such circumstances, Stein was unwilling to vouch for Silvani's testimony and did not call him. When asked why he did not immediately inform the trial judge of the alleged intimidation of his witness, Stein stated that he would necessarily have had to disclose to the court defendant's prior convictions in connection with the intimidation inquiry (one of the alleged acts of intimidation was the prosecution's informing Silvani of defendant's prior criminal record), and that he was unwilling to do that since his client was being tried by the court alone. Stein agreed, however, that he could have informed the trial judge of the alleged intimidation, asked for an inquiry with regard thereto, and then, if thought necessary, for a change of venue to another judge.

The court also heard, on the motion for a new trial, the testimony of Tully and Captain Higgins, the alleged intimidators. They admitted that they had declared to Silvani their disbelief of his account of the bracelet purchase; that they told him he was being "used" by defendant; that Tully advised him that defendant had a prior criminal record; and that they warned him of the consequences of perjury. Tully denied telling Silvani that if he testified for defendant he would lose his job and go to jail, or that he told Silvani that he would be a State's witness. Captain Higgins specifically denied that he had called Silvani a liar, that he had threatened Silvani's wife, or that he had spoken to Silvani in a loud belligerent tone. Tully further testified that he had disbelieved Silvani's statement as to the bracelet purchase in that Silvani told Tully during their interview that he (Silvani) had been initially contacted by defendant with regard to the contemplated alibi testimony prior to defendant's arrest, leaving, in Tully's mind, the clear inference

that the alibi had been manufactured. Tully also disclosed during his testimony that Silvani denied any acquaintance with defendant prior to the bracelet purchase. In this connection, several witnesses testified for the State at the hearing on the motion for a new trial that they had observed Silvani and defendant in close proximity to each other on several occasions at the Chicago Health Club prior to December 21, 1966.

The trial judge further heard, on the motion for a new trial, the testimony of Matthew Walsh, another assistant State's Attorney who had worked with Tully in the prosecution of defendant. Walsh testified that he had secured the issuance of a subpoena for Silvani's appearance on November 20, 1968, because he had mistakenly thought that the trial would indeed commence on that day, and not merely in order to secure Silvani's presence for interrogation. Walsh did, however, admit that it was his custom to interview prospective defense witnesses before they actually testified.

After hearing the foregoing testimony, the trial judge denied defendant's motion for a new trial, specifically finding, *inter alia,* that the State had not been guilty of either intimidating a prospective defense witness or abusing the court's process. We cannot say that his conclusions were erroneous. The threats and abuse charged by Silvani were specifically denied from the witness stand by those accused of same. Further, we have previously held that it is not improper for a prosecuting attorney to advise prospective witnesses of the penalties for perjury (*People* v. *Flowers,* 14 Ill.2d 406, 415), and we do not believe those charged with the responsibility of enforcing the criminal law should be precluded from voicing their disbelief of a prospective witness's contemplated testimony. While we do not approve of the prosecutor's advising a prospective defense witness of the accused's prior criminal record in an effort to dissuade such witness from testifying, it is clear that the State's interview of Silvani did not deprive defendant of the use of

Silvani as a witness. The record establishes that Silvani was present at the court largely throughout the trial and was thus available as a witness for either the defense or the State. *People* v. *Williams,* 40 Ill.2d 367 and *People* v. *Wilson,* 24 Ill.2d 425, relied upon by defendant, are not controlling in that in those cases the prosecuting authorities actually caused witnesses to leave the jurisdiction, insuring their unavailability to the defense. In *Thompson* v. *People,* 410 Ill. 256, it was charged that the authorities had not only refused to serve defense-requested process on a witness, but also had threatened certain witnesses and caused them to leave the jurisdiction until the trial was over. No such conduct appears here. Another case cited by defendant, *Gandy* v. *State,* 24 Neb. 716, 40 N.W. 302, is also inapposite. There the prosecutor candidly admitted that he sought to dissuade two witnesses from testifying for the defense, and that a number of assertions were made against the defendant to the prospective witnesses. As we have seen, the authorities here denied any overt attempts to dissuade Silvani from testifying. With regard to the claimed abuse of process, the record supports the trial court's conclusion that Silvani was subpoenaed to insure his attendance at the trial, and not for the purpose of intimidation. The subpoena apparently required his appearance at the courtroom in which defendant was to be tried and while court was in session, and, thus, *United States* v. *Standard Oil Company* (7th cir.), 316 F.2d 884, 897, cited by defendant, is inapposite. In that case it was held improper for the prosecution to cause the issuance of subpoenas compelling witnesses' attendance at a place other than the court at a time when the court was not in session.

The defendant next seeks to question the constitutionality of the so-called "alibi statute" (Ill. Rev. Stat. 1967, ch. 38, par. 114—14) on the ground that, in requiring an accused to either disclose prior to trial his intention to assert an alibi and the names and addresses of his alibi witnesses,

or possibly be precluded from asserting the alibi at the trial, the statute forces the defendant to choose between his right to refuse to testify and his right to call witnesses in his defense. The Supreme Court of the United States in *Williams* v. *Florida,* 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893, decided June 22, 1970, disposes of this contention adversely to the defendant. Additionally, the record discloses no objection by the defense to the State's request for production of names and addresses of alibi witnesses, and no argument was made with regard thereto in defendant's motion for a new trial. It is clear that nonjurisdictional questions relating to constitutionality of a statute must be asserted in the trial court, and we hold that the matter is deemed waived. *United States* v. *Hoskins* (7th cir.), 406 F.2d 72, 74-75.

It is finally asserted that we should reduce defendant's sentence. While we do have the authority in a proper case to order the reduction of a sentence imposed by the trial court (see our Rule 615(b)(4), 43 Ill.2d R. 615(b)(4)), we do not think such power should be exercised here. The penalty prescribed by statute for armed robbery at the time of the offense herein was imprisonment in the penitentiary for an indeterminate term of not less than one year. (Ill. Rev. Stat. 1965, ch. 38, par. 18—2.) It was shown during the hearing in aggravation and mitigation that defendant had prior convictions for assault with a deadly weapon and four separate counts of armed robbery. Under such circumstances, it cannot be said that the possibility of his rehabilitation would be enhanced by a lighter sentence. We believe that the trial judge, who observed the defendant and heard the evidence, was in a much better position than this court to render a proper sentence. *People* v. *Caldwell,* 39 Ill.2d 346; *People* v. *Taylor,* 33 Ill.2d 417.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE SCHAEFER took no part in the consideration or decision in this case.