**EDWARD J. SWEENEY & SONS, INC., and Mission Gas Oil Company, Inc. and Petroleum Products Co., Appellants,**

v.

**TEXACO, INC.**

No. 79–2468.

United States Court of Appeals, Third Circuit.

Argued Aug. 6, 1980.

Decided Nov. 3, 1980.

106

Mitchell A. Kramer (argued), Steven Kapustin, Kramer & Salus, Philadelphia, Pa., for appellants.

Randall B. Robinson, White Plains, N. Y. (argued), Kaye, Scholer, Fierman, Hays & Handler, New York City, Duane, Morris & Heckscher, Philadelphia, Pa., for appellee Texaco, Inc.; Milton J. Schubin, Randolph S. Sherman, Ira S. Sacks, New York City, Jane D. Elliott, Philadelphia, Pa., of counsel.

Thomas A. Rothwell, Mark J. Yeager, Washington, D. C., for amicus curiae Small Business Legislative Council.

Before ALDISERT and SLOVITER, Circuit Judges, and RAMBO, District Judge.*

* Honorable Sylvia H. Rambo, of the United States District Court for the Middle District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major question for decision in this appeal by unsuccessful plaintiffs in an antitrust action is whether they established a prima facie case of a "contract, combination, ... or conspiracy, in restraint of trade ..." in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Sweeney, a wholesale and retail distributor of Texaco fuels, and two of its wholesale customers attempted to prove that Texaco unlawfully conspired with other fuel distributors and retailers to fix the retail price of Texaco motor fuel. Determining that appellants had failed to introduce evidence from which a jury could infer the existence of a conspiracy, the district court directed a verdict in favor of Texaco.

The district court also directed a verdict against appellants on their claims that Texaco violated § 2 of the Sherman Act, 15 U.S.C. § 2, and § 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a). In addition, the district court dismissed damage claims against Texaco raised by Mission Gas Oil Company and Petroleum Products Company. The court granted Texaco's prayer for injunctive and declaratory relief against Sweeney concerning Sweeney's practice of misrepresenting non–Texaco fuel as Texaco fuel. Sweeney, Mission, and Petroleum Products appeal these adverse rulings. We conclude that the district court did not err and, therefore, we affirm.

### I.

We need recite only those facts essential to this appeal because of the extensive elaboration already undertaken by the district court. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243, 249–51 (E.D. Pa.1979). Appellant Edward J. Sweeney & Sons, Inc., is a wholesaler and distributor of Texaco motor fuels in Eastern Pennsylvania and Southern New Jersey. In addition to its wholesale business Sweeney owns several retail gasoline stations. Mission Gas Oil Company, Inc., and Petroleum Products Company are distributors who purchase fuel from Sweeney. The defendant Texaco, Inc., refines and sells gasoline and other petroleum products.

After several years as a consignee and wholesaler for other companies, Sweeney became a Texaco wholesaler and distributor in 1958. In 1963 Sweeney and Texaco entered into the distributor agreement at the heart of this litigation. Part of the agreement provided that Sweeney would haul its own fuel. When it sells motor fuel to distributors, Texaco charges a price that includes the cost of delivering the product to the distributor's bulk plant. If the distributor picks up fuel at Texaco's plant, however, as Sweeney did, it receives a discount or hauling allowance. The discount equals the lowest amount it would cost Texaco to deliver the fuel from a designated distribution point to the purchaser's bulk plant by common carrier, contract carrier, or Texaco company truck. Texaco initially designated its terminal in Westville, New Jersey, as Sweeney's pick–up point. Accordingly, Sweeney received a hauling allowance equal to the common carrier rate for trips between Westville and its bulk plant located in Pottstown, Pennsylvania.

Sweeney used the hauling allowance to its advantage. Between 1965 and 1970 Sweeney acquired several retail gasoline stations in addition to ones it already owned. The newly acquired stations were located within a twenty mile radius of Texaco's Westville, New Jersey, terminal. Sweeney picked up fuel in Westville and transported it directly to these stations. This practice enabled Sweeney to receive an allowance for hauling fuel from Westville to Pottstown, roughly fifty miles, while hauling it less than twenty miles. Receiving the greater allowance effectively lowered Sweeney's cost for gasoline which in turn allowed Sweeney to lower its retail prices.

Use of the hauling allowance was just one part of Sweeney's retail marketing strategy. A second major part was "no–frills" retailing. Prior to 1965, Sweeney's retail stations offered complete automobile

repair and maintenance services in addition to fuel. Sometime in 1965 or 1966, Sweeney's stations began eliminating these services, becoming "gas and go" outlets. The lowered overhead at these stations allowed Sweeney to reduce its retail prices further. Unlike other discount outlets which sold gas under their own names, Sweeney's stations sold fuel under the Texaco name. Sweeney offered gasoline at a price between one and three cents lower than the price at which other retailers in the area offered major brand gasoline. After Sweeney adopted this no-frills retail sales practice, its retail sales and profits increased steadily.

Sweeney's prosperity did not augur well with competing Texaco retailers. Beginning in 1966, some of these retailers complained to Texaco that Sweeney's discount pricing was hurting their businesses. Sweeney contends that Texaco conspired with these retailers to terminate Sweeney's distributorship or to reduce its hauling allowance and thereby force Sweeney to raise its prices. Sweeney cites Texaco's actions in 1970 and 1971 as evidence of this alleged conspiracy.

The evidence disclosed that as early as 1966 Texaco had reviewed the status of Sweeney's hauling agreement. Texaco found that it could save at least $2,158 annually by supplying Sweeney from Macungie, Pennsylvania, rather than from Westville, New Jersey, due to Macungie's proximity to the Sweeney plant. When it learned of Texaco's consideration of a change to Macungie, Sweeney objected and Texaco postponed its decision on the matter.

By 1970, the economics of supplying Sweeney out of Westville had changed drastically. Instead of $2,158, Texaco's loss attributable to supplying Sweeney from Westville had risen to more than $58,000 annually. Texaco informed Sweeney in December, 1970, that it was changing Sweeney's supply point from Westville to Macungie under a provision in the hauling agreement permitting Texaco to terminate the agreement or to change the pick-up point. Nevertheless, Sweeney refused to go along with the change to Macungie. Texaco then notified Sweeney that it was terminating Sweeney's distributor and hauling agreements in sixty days, effective February 28, 1971.

After it received the termination notice, Sweeney attempted but failed to obtain an alternate source of supply. Sweeney then negotiated with Texaco. As a result of the negotiations, Sweeney's distributor's agreement was not terminated and the parties agreed on a compromise hauling arrangement on March 1, 1971.

Under the new hauling agreement, Sweeney continued to pick up at Westville until May 31, 1971, and received the allowance it had been getting for the distance from Westville to Pottstown. Thereafter, Sweeney picked up fuel at Macungie and received a hauling allowance based on the Macungie to Pottstown rate. Texaco also agreed that after May 31, 1971, Sweeney could pick up fuel at either location, at Sweeney's option, although the hauling allowance for all purchases would be based on the Macungie to Pottstown trip. This agreement mitigated the effect of the change in the hauling allowance by permitting Sweeney to continue supplying its southern New Jersey stations from nearby Westville.

After this new hauling agreement became effective, Sweeney began delivering non-Texaco fuel to Texaco brand stations in trucks bearing the Texaco trademark. Texaco learned of Sweeney's commingling and conducted a thorough investigation of Sweeney's operations using Texaco security personnel. The investigation confirmed Texaco's suspicion of Sweeney's pervasive trademark violations.

On December 17, 1971, Daniel A. Doherty, Texaco's Manager for the Philadelphia Region, told Texaco's Vice President of Sales, United States, of his decision to terminate Sweeney's distributor and hauling agreements. Doherty based his decision primarily on Sweeney's trademark violations and misrepresentations. In addition, Doherty explained that Sweeney's stations failed to maintain Texaco's brand integrity,

image, quality, and prestige standards. Sweeney's stations were the subject of an inordinate number of consumer complaints about service. Credit card users, a particularly valued segment of the market, complained of credit card irregularities at Sweeney's stations. Coupled with Sweeney's practice of representing non–Texaco fuel as Texaco fuel, this evidence of Sweeney's failure to meet Texaco's standards led Doherty to believe that Sweeney was damaging Texaco's valuable trademark and image.

Texaco notified Sweeney that effective February 29, 1972, it would terminate both the 1963 distributor agreement and the March 1, 1971, hauling agreement. Although Sweeney tried again to obtain an alternate source of supply, it was again unsuccessful. After various negotiations, Texaco agreed to supply Sweeney until it gave a ten day notice of its intention to discontinue Sweeney's supply. No termination notice has been given, and Texaco continues to provide Sweeney with fuel.

The present litigation followed these events. Sweeney charged that Texaco conspired in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, with the dealers who complained about Sweeney's competitive practices. It also alleged that Texaco violated § 2 of the Sherman Act, 15 U.S.C. § 2, by attempting to monopolize the sale of Texaco fuel. Finally, Sweeney averred that Texaco discriminated against it in the price Texaco charged for fuel and thereby violated § 2(a) of the Clayton Act as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a). Mission Gas Oil Company and Petroleum Products Company, two of Sweeney's wholesale customers, joined in Sweeney's lawsuit. Plaintiffs sought damages and injunctive relief. Texaco counterclaimed against Sweeney seeking injunctive and declaratory relief from Sweeney's com-

mingling practices, basing its claims on various state, federal, and common law provisions. The district court dismissed Mission's and Petroleum's damage claims on the ground that they were improper plaintiffs because they did not purchase fuel directly from Texaco. After the close of the evidence the district court directed a verdict denying all of appellants' remaining claims and granting Texaco's prayer for injunctive and declaratory relief. Appellants challenge these adverse rulings.

## II.

The only § 1 contention before us is appellants' claim that certain Texaco dealers conspired with Texaco to have Texaco terminate Sweeney as a distributor or to reduce its hauling allowance.[1] Appellants' theory is that these retail dealers complained to Texaco about Sweeney's practice of retailing gasoline between one and three cents below their price, and that as a result of their complaints Texaco reduced Sweeney's hauling allowance to the rate set in the March, 1971, agreement. Appellants contend that the retailers' acts of complaining and Texaco's reaction to the complaints constituted concerted action in restraint of trade. The district court determined that appellants failed to offer sufficient evidence to permit a reasonable inference that Texaco terminated Sweeney's distributor agreement or changed Sweeney's hauling allowance because of competitors' complaints. We find no error in this determination. Moreover, we note that even if appellants had demonstrated that Texaco's actions were in response to these complaints, such evidence alone would not show the necessary concerted action.

Unilateral action, no matter what its motivation, cannot violate § 1. *United*

---

1. Although Sweeney initially asserted antitrust damages based on the 1971 termination, it withdrew this claim during trial. App. at 1826a–27a; Transcript of Oral Argument at 12. Only the claim of damages based on the change in hauling allowance was before the court on the motion for directed verdict, and therefore only that claim is before us now. Nevertheless, we accept for purposes of argument that both the termination and the change in hauling allowance were parts of a single alleged conspiracy. The 1971 termination was before the court on plaintiff's claim for injunctive relief, with the court sitting as the trier of fact, and the court's denial of that relief is discussed in section V, *infra*.

States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1072 (3d Cir. 1978); *Tripoli Co. v. Wella Corp.*, 286 F.Supp. 264, 266 (E.D.Pa. 1968), *aff'd*, 425 F.2d 932 (3d Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970). By its terms, § 1 requires proof of a "contract, combination . . . or conspiracy." 15 U.S.C. § 1. We have noted that the statutory language presents a single concept about common action, not three separate ones: " 'contract . . . combination or conspiracy' becomes an alliterative compound noun, roughly translated to mean 'concerted action.' " *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 445–46 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (quoting L. Sullivan, Law of Antitrust 312 (1977)).

■ To establish the existence of concerted action, appellants had to submit evidence from which a jury could reasonably infer that Texaco and others had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Klein v. American Luggage Works, Inc.*, 323 F.2d 787, 791 (3d Cir. 1963); *United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir. 1963). Direct proof of an express agreement is not required. On the contrary, the plaintiff may rely on an inference of a common understanding drawn from circumstantial evidence: "The picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age." *William Goldman Theatres v. Loew's, Inc.*, 150 F.2d 738, 743 n.15 (3d Cir. 1945). Nevertheless, appellants had the burden of adducing sufficient evidence from which the jury could find illegal concerted action on the basis of reasonable inferences and not mere speculation. *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1312 (3d Cir. 1975).

■ The necessary first step toward appellants' proof of a prohibited § 1 conspiracy was proof of a causal relationship between competitor complaints that Sweeney was selling Texaco gasoline several cents below their own price, and the reduction of Sweeney's hauling allowance. *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 168 (3d Cir. 1979). The mere reception of complaints by Texaco would be insufficient to prove this causal nexus. Nor would it suffice to prove only that some Texaco employees who knew of the complaints were also the ones who decided to terminate Sweeney's distributor agreement and change its hauling allowance.[2] The evidence must permit the inference that the alleged conspirators "had a unity of purpose or a common design and understanding, or a meeting of the minds." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). *See Klein v. American Luggage Works, Inc.*, 323 F.2d at 791.

■ Appellants claim that they submitted sufficient evidence to allow an inference of illegal concerted action. They point to testimony that beginning in 1966 or 1967 and continuing through 1979 some lessees of stations owned by Texaco complained to the refiner that certain stations supplied by Sweeney were marketing gasoline two or three cents per gallon lower than their prices. To establish their point, appellants relied on the testimony of several witnesses, but especially that of James P. Rodden, Daniel A. Doherty, and Glenn B. Murray.

### A.

Rodden is a former Texaco sales representative who left Texaco to become a part-

---

**2.** There are special reasons for applying this precept to a case in which a manufacturer receives price cutting complaints from competitors of a particular customer. To permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of its independent business judgment and emasculate the terms of the statute. As Professor Areeda has explained, many cut off dealers in this situation will be tempted to harass their former suppliers with treble damage suits. Recognizing the potential for harassment, courts should hesitate to scrutinize too closely the supplier's ambiguous refusal to sell. P. Areeda, Anti–Trust Analysis 560 (2d ed. 1974).

ner of William D'Ippolito, a leading stockholder and managing officer in Sweeney and other petroleum products businesses. He testified that as early as 1966 or 1967 some Texaco retailers complained about pricing by stations supplied by certain Texaco distributors. Rodden explained that these complaints related both to stations supplied by Sweeney and to stations supplied by other Texaco distributors. App. at 927a–95a. He testified that he was not aware of any discussions within Texaco about changing Sweeney's hauling allowance in March, 1971, and that he did not discover the reduction until 1973. App. at 799a–801a.

Rodden testified that he "believed" Texaco changed Sweeney's hauling allowance because of the retailer complaints about the loss of volume at Texaco's retail stations. Rodden admitted, however, that his "belief" was just unsupported surmise, without factual basis. App. at 842a–46a. The district court determined that the surmise of Rodden "cannot, as a matter of law, support a jury finding of a contract, combination, or conspiracy between Texaco and other Texaco dealers either in 1970 or 1971." 478 F.Supp. at 255. We agree. In our view, Rodden's testimony goes no further than merely identifying retailer complaints. We turn now to other possible evidence of concerted action.

### B.

Appellants argue that proof of concerted action was also forthcoming from the testimony of Daniel A. Doherty, the manager of Texaco's Philadelphia region. Appellants assert that Doherty made the actual decision to terminate Sweeney's distributorship, "basing his decision partially on Sweeney's marketing strategy." Appellants' Brief at 18.

Doherty's testimony provides no help to Sweeney's theory. On June 8, 1979, appellants introduced the following deposition testimony of Doherty:

Q. Were you aware that Sweeney was a price–cutter in the area?

A. I was aware that Sweeney was engaging in a marketing strategy where the principal attraction of those retail outlets that he supplied was primarily, if not exclusively, based upon posting a price generally lower than major brand price in the areas.

App. at 1162a.

Q. What factors entered into your decision to terminate Sweeney as the distributor?

A. Sweeney's marketing strategy that I observed and the consequences of it that I observed . . . .

Q. Is that the marketing strategy referred to previously?

A. There [were] other elements of it.

.     .     .     .     .

A. As a consequence of the kinds of retail operations that Sweeney apparently solicited and acquired wherein the . . . primary business builder of the locations was a low, highly competitive retail price, the outlets to a concerning if not alarming degree did not meet the standards of housekeeping, service, or service capability. In addition to that, we received continuing customer complaints from Texaco customers and motorist customers and, more alarmingly, the best class of customer that we had was being impacted very heavily, and that was our credit card customers, because my memory is that his retail outlets were involved in credit card irregularities and it was apparent that Sweeney's . . . marketing strategy, relied entirely on having the lowest or one of the lowest prices, which is entirely his prerogative, the prerogative of those people he serviced. But, the trend away from the prestige service that had been the hallmark and the objectives of Texaco retail marketing, certainly from my entire career, was clear, and was adversely impacting, in our opinion, on the entire brand integrity of Texaco in the area.

Id. at 1602a–03a.

On June 13, 1979, appearing in open court, Doherty stated during cross examination by Sweeney's counsel:

Q. Now, did you discuss the fact Mr. Sweeney was a price cutter with Mr. Hicks, prior to Sweeney's termination?

A. I made the point yesterday, Mr. Kramer, that I never regarded Sweeney as a price cutter because I knew nothing about Sweeney's pricing. I don't know what he sold his retail for, so I couldn't characterize him as a price cutter. I never have.

. . . .

Q. Now Mr. Doherty, isn't it a fact that at the time of your deposition you said that one of the factors among many . . . that entered into your consideration to terminate Sweeney was the pricing practices of the Sweeney supplied stations?

. . . .

A. No, sir.

Q. So, you're still saying that pricing in your view had no effect on your decision?

A. Yes, sir.

App. at 1593a, 1605a–06a.

Appellants suggest that this testimony provided the quantum of evidence necessary to get their case to the jury. Appellants' best case is Doherty's deposition statement that Sweeney's distributorship was terminated because of Sweeney's marketing strategy. That strategy, Sweeney maintains, was, in Doherty's words, "based upon posting a price generally lower than major brand prices in the area." But Doherty immediately explained that he included other elements of the "marketing strategy and the consequences of it." He emphasized that Sweeney "relied entirely on having the lowest or one of the lowest prices, which *is entirely his [Sweeney's] prerogative, the prerogative of those people he serviced." Id.* at 1162a (emphasis added).

Viewed in the light most favorable to the appellants, only three reasonable and permissible inferences relevant to Sweeney's lawsuit flow from this testimony. First, Texaco did not object to Sweeney's low prices. Pricing was "entirely" Sweeney's prerogative. Second, Texaco's concern over Sweeney's marketing strategy grew out of Sweeney's failure to meet housekeeping, service, or service capability standards–practices contrary to "the prestige service that had been the hallmark and objective of Texaco retail marketing"–and resulting customer complaints. Third, these concerns led Doherty to the decision to terminate Sweeney's distributorship.

Appellants maintain that the jury should have been permitted to infer from this testimony that Doherty decided to terminate Sweeney because Texaco received complaints from Sweeney's competitors that Sweeney was underselling them. This inference is impermissible. In both his deposition and in court, Doherty testified that although he was generally aware of Sweeney's pricing policies, he did not consider these policies unacceptable except insofar as they adversely affected Sweeney's customer service. In his deposition he stated flatly that pricing was Sweeney's prerogative. Appellants would have the jury infer that Doherty's asserted explanation was mere pretense and that Doherty actually terminated Sweeney's agreement as part of an illegal scheme. Absent some evidence supporting appellants' theory, we will not assume Doherty lied about his reasons. The district court correctly prevented the jury from speculating on the existence of a conspiracy on the basis of such meager evidence.

C.

Appellants also rely on Glenn B. Murray's testimony, arguing that Murray's belief "that Texaco had terminated Sweeney because of Sweeney's competitive abilities as against other Texaco retailers and wholesalers" supports their § 1 claim. Appellants' Brief at 17. An examination of portions of the record relied on by appellants discloses no evidence in support of this argument:

Q. I take it from your testimony that you have no personal knowledge of why Texaco wanted to terminate Sweeney?

A. [N]o direct personal knowledge, no.

Q. Tell us what, if any, knowledge you do have, whether it is direct or indirect?

. . . .

A. Well, it would be just the general feeling that E. J. Sweeney and Sons had literally expanded their operation [to] the point where they were picking up product in Westville and delivering it virtually next door in some instances, well within ten miles, 15, 20 miles of the terminal, and being granted hauling allowances for [the] distance up to Pottstown. And, as a result, they were in a much better competitive position than others would have been.

App. at 1347a–48a.

We cannot conclude that Murray's testimony, alone or in conjunction with that of others, made out a jury case of concerted action. Murray's testimony did not refer to complaints of price cutting or of Texaco's response to such complaints. His testimony, admittedly not based on personal knowledge, was entitled to little or no weight by the trial judge. The "general feeling" he expressed concerning Sweeney's competitive position cannot support an inference of concerted action or buttress any inferences of concerted action drawn from other testimony.

Putting aside the testimony of Rodden, Doherty, Murray and the others on which appellants rely,[3] appellants have failed to show that Texaco's actions contradicted the refiner's economic self–interest. Speaking through Chief Judge Seitz, our court has isolated "two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior: (1) a showing of acts by defendants in contradiction of their own economic interests . . . and (2) satisfactory demonstration of a motivation to enter an agreement." *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1314 (3d Cir. 1975) (citations omitted). *Venzie* sets forth one means of establishing a conspiracy circum-

stantially. Clearly, by lowering the hauling allowance, Texaco acted in its self interest, and was not proceeding contrary to its "own economic interests." The change saved it $58,000 per year on sales to Sweeney. This undisputed fact negates an inference of concerted action that might exist if both factors of *Venzie* were satisfied.

Moreover, the record indicates that the complaints began in 1966, five years before the acts in question, and continued until 1979, eight years after Texaco altered the agreements with Sweeney. There is no evidence showing the frequency of the complaints or whether the frequency changed at any time. These facts militate strongly against a causal relation between the complaints and Texaco's actions. Furthermore, the change in Sweeney's hauling allowance was less than one cent per gallon.[4] It is difficult to accept appellants' assertion that an action affecting Sweeney's cost by a fraction of a cent was taken in response to complaints citing price differentials of several cents, even when taking into account the millions of gallons sold.

Appellants urge that *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979), requires a different result. We agree with the district court that it does not. Appellants argue that *Cernuto* stands for the proposition that when a manufacturer terminates a distributor's supply because of complaints from other distributors concerning price cutting, these actions make out a § 1 claim without proof of concerted action. Appellants' Brief at 22–23. We reject this interpretation. *Cernuto* decided simply that cut–off distributors in these circumstances need not prove anti–competitive effects to prevail in a § 1 lawsuit. Such action "per se" unreasonably restrains trade. 595 F.2d at 170.

___

**3.** In addition to Rodden, Doherty, and Murray, appellants also relied on testimony of Paul B. Hicks, Texaco Vice President of Sales, United States, and Edward C. Enstice, Texaco assistant regional wholesale manager. Appellants' Brief at 17–18. At best, this testimony merely repeats other testimony showing Texaco knew of retailer complaints concerning Sweeney's pricing policies. Investigation followed the

complaints, but the conclusion was that the practices were not objectionable. App. at 1053a, 1078a–80a, 1114a–1120a.

**4.** Prior to June 1, 1971, Sweeney received an allowance of $.0146 per gallon. After June 1, 1971, the allowance was $.0069 per gallon, or a decrease of $.0077. App. at 309a, 497a.

The question that appellants contend *Cernuto* resolved was not before the court. In *Cernuto*, the district court granted defendant's motion for summary judgment, concluding that the plaintiffs could not prove defendants' actions constituted an unreasonable restraint of trade. The district court, using Justice Black's formulation in *Northern Pacific Railroad Corp. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1948), observed that while the action did have a "pernicious effect" on competition, it was not devoid of "redeeming virtue." *Cernuto v. United Cabinet Corp.*, 448 F.Supp. 1332, 1334–37 (W.D.Pa.1978). The manufacturer's decision actually enhanced competition among different manufacturers. Thus, the district court noted, the plaintiffs could not prove a necessary element of their case. Although this court rejected Cernuto's need to prove anti–competitive effects, we did not obviate a showing of "unity of purpose or common design and understanding." *American Tobacco*, 328 U.S. at 810, 66 S.Ct. at 1139. In summarizing the decision we said:

> If *Cernuto* can prove at trial that United, Lappin and Famous conspired to protect Famous from price competition by Cernuto, and that United and Lappin terminated Cernuto at Famous' request and in pursuit of a price related end, then it can prevail on a price–fixing theory notwithstanding its failure to show any impact on competition involving kitchen cabinet sales in Western Pennsylvania. Of course, at trial the defendants may be able to demonstrate that the evidence does not at all conform to what plaintiff has alleged.

595 F.2d at 170 (emphasis added). *Cf. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954) ("Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but 'conscious parallelism' has not yet read conspiracy out of the act entirely.").

We agree with the district court that aside from the evidence of complaints made to Texaco by other retailers, Sweeney introduced no evidence of a conspiracy between Texaco and its retailers or wholesalers. In the absence of evidence that Texaco decided to terminate Sweeney because of competitor complaints and evidence of such a conspiracy, it would have been improper for the court to allow the jury to speculate on the cause for Texaco's action.

### D.

The teachings of the Supreme Court are clear on when a matter may be submitted to the jury:

> The matter is essentially one to be worked out in particular situations and for particular types of cases. Whatever may be the general formulation, the essential requirement is that mere speculation not be allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.

*Galloway v. United States*, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943). A reviewing court applies the same standard to a decision by a trial judge granting a motion for directed verdict. The appellate court must consider the record as a whole and in the light most favorable to the non–moving party, drawing all reasonable inferences to support its contentions. If no reasonable resolution of the conflicting evidence and inferences therefrom could result in a judgment for the non–moving party, the appellate court must affirm the lower court's decision. *See Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum and Chemical Corp.*, 579 F.2d 20 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1979).

The jury's role in our legal tradition probably represents modern America's unique characteristic in the trial of civil cases. Its role cannot be minimized, nor its importance dissipated one iota. Yet the limits of the jury's role must always be recognized. The jury translates as found fact a congeries of relevant evidence on controverted factual issues. The jury does not engage in

the final stage of this process until the court makes the critical legal decision that there is sufficient evidence to submit to the jury for the purpose of resolving conflicts in the evidence or inferences permissibly drawn from the evidence, or both. In removing a case from the jury, the court undertakes the vital task of "protecting neutral principles of law from powerful forces outside the scope of the law—compassion and prejudice." *Rutherford v. Illinois Central R.R.*, 278 F.2d 310, 312 (5th Cir.), cert. denied, 364 U.S. 922, 81 S.Ct. 288, 5 L.Ed.2d 261 (1960).

The court's role is especially crucial when, as here, the plaintiff's case, and therefore the defendant's liability, is based solely on circumstantial evidence. The illegal action must be inferred from the facts shown at trial. Inferred factual conclusions based on circumstantial evidence are permitted only when, and to the extent that, human experience indicates a probability that certain consequences can and do follow from the basic circumstantial facts. The inferences that the court permits the jury to educe in a courtroom do not differ significantly from inferences that rational beings reach daily in informally accepting a probability or arriving at a conclusion when presented with some hard, or basic evidence. A court permits the jury to draw inferences because of this shared experience in human endeavors. *See generally*, McCormick, Handbook of the Law of Evidence 289–96 (2d edition 1972). Perhaps the only distinction between extracting factual conclusions from circumstantial evidence in daily life and in the courtroom is that a jury's act of drawing or not drawing an inference is preceded by a judge's instruction. The instruction serves to guide the jury through some process of ordered consideration. The court informs the jury that it must weigh the narrative or historical evidence presented, making credibility findings when appropriate, and then draw only those inferences that are reasonable in reaching a verdict.

When a trial court grants a directed verdict in a circumstantial evidence case, the court makes a legal determination that the narrative or historical matters in evidence allow no permissible inference of the ultimate fact urged by the opposing party. It decides that no reasonable person could reach the suggested conclusion on the basis of the hard evidence without resorting to guesswork or conjecture. To permit a jury to draw an inference of the ultimate fact under these circumstances is to substitute the experience of logical probability for what the courts describe as "mere speculation." *Galloway v. United States*, 319 U.S. at 395, 63 S.Ct. at 1089; *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d at 25.

Logicians describe one process of reaching an ultimate fact from insufficient basic facts as the *false cause* or *post hoc* fallacy. The fallacy consists of reasoning from sequence to consequence, that is, assuming a causal connection between two events merely because one follows the other. For this reason the fallacy is often referred to as that of *post hoc ergo propter hoc* (after this and therefore in consequence of this), an expression which itself explains the nature of the error.

Here, the district court properly concluded that the basic facts adduced at trial were insufficient to allow the jury to find for appellants. The basic record facts were that some of Sweeney's competitors complained that Sweeney's stations undersold them by one to three cents per gallon, that Rodden did not know but "guessed" Texaco acted to terminate Sweeney because of these complaints, that Murray surmised Texaco was evaluating Sweeney's ability to get long hauling allowances for short deliveries, and that certain consequences of Sweeney's marketing strategy not directly related to Sweeney's competitive position figured into Doherty's decision to terminate Sweeney. Faced with this scanty record, the district court properly removed the issue of concerted action from the jury. It determined that insufficient narrative or historical evidence had been submitted to permit the conclusion that Texaco's decision was a reaction to the specific complaints received. Moreover, the record was devoid of proof of concerted action among Swee-

ney's competitors and Texaco. The court concluded that the jury could not infer this ultimate fact from the basic facts in evidence without engaging in pure *post hoc* guesswork. We will not fault the court for these determinations.

## III.

The district court also directed a verdict for Texaco on appellants' claims that Texaco attempted or conspired to monopolize the Texaco gasoline market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. The court explained that "Sweeney has failed to produce any evidence from which a jury could find that Texaco gasoline constitutes a product market for § 2 purposes." 478 F.Supp. at 267. We find appellants' contentions on this issue devoid of merit.

■ First, we hold an antitrust plaintiff in an appeal to the theory advanced at trial. There, Sweeney represented, and properly so, that the focal point of any discussion of its § 2 damage claims is the issue of relevant market. By letter dated May 24, 1979, Sweeney agreed that

if a court and/or jury in *[Sweeney v. Texaco]* does not determine that a relevant product market or submarket is limited to "Texaco gasoline," then Texaco has not violated Section 2 of the Sherman Act.

We will not permit appellants to repudiate that agreement. *See American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1246 (3d Cir. 1975) ("AMI will be bound by its own analysis in open court of the issues to be litigated.").

Moreover, the theory of Ninth Circuit cases cited by Sweeney to support its argument–*Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), and *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964)–was rejected by this court in *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3d Cir. 1975). *Coleman* expressly held that definition of the relevant market was critical in § 2

attempt cases, specifically repudiating the Ninth Circuit view that it is possible to find an attempt to monopolize without such proof. *Id.* at 1348 n.17.

■ To establish that Texaco gasoline alone constituted a relevant market or submarket, appellants had to prove that Texaco gasoline was not considered reasonably interchangeable with other brands of gasoline and non–branded gasoline by a significantly large number of consumers. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962); *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 393, 395, 399–400, 76 S.Ct. 994, 1006, 1007, 1009, 100 L.Ed. 1264 (1956); *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d at 26–27. There must be evidence, for example, of "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524; *Columbia Metal*, 579 F.2d at 27. Appellants offered no such evidence.

■ The evidence mandates the conclusion that the range of commodities "reasonably interchangeable by consumers for the same purposes" includes all brands of gasoline and that there are no product submarkets. By Sweeney's own assertion, gasoline is a fungible commodity. Sweeney itself continually bought gasoline from other refiners. Moreover, uncontradicted testimony indicated that Sweeney's gas stations competed not only with Texaco stations, but also with other brand and non–brand stations. Similarly, the record shows that Sweeney competed with other wholesalers offering non-Texaco fuel. App. at 620a–31a, 735a–37a, 760a, 855a–56a, 916a–18a, 957a–62a. Paraphrasing the conclusion by Judge, now Justice, Stevens in *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 296–97 (7th Cir. 1974) (footnote omitted): "Under the kind of economic analysis employed by both the majority and the dissent in *United*

*States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, plaintiff clearly failed to prove that sales of [Texaco] petroleum products in [the area in question] constitute a relevant market."

Appellants contend that the value of the Texaco trademark establishes Texaco gasoline as a separate relevant submarket. They also contend that because Texaco stations can only sell Texaco fuel a product submarket exists for them. Accepting these arguments would lead to the conclusion that every manufacturer of a trademarked product has monopoly power over that product. No legal precept stands for this proposition, as the Supreme Court has emphatically held:

> [O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power of the price and production of his own product. However, this power that, let us say, automobile or soft–drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

*United States v. E.I. duPont de Nemours & Co.*, 351 U.S. at 393, 76 S.Ct. at 1006 (footnote omitted). *See also, Columbia Metal,* 579 F.2d at 27 n.11.

If, on the other hand, the relevant market is all motor fuel sold in the area of Sweeney's stations, Texaco could not monopolize that market by driving Sweeney out of business. The retail price of Texaco gasoline sold by Sweeney's competitors and wholesale prices of Texaco fuel were determined to a large extent by market conditions of supply and demand involving all brand and non–brand gasoline. Competi-

tion from other refiners and independent dealers would severely limit Texaco's ability to succeed. *See Coleman,* 525 F.2d at 1348–49.

Accordingly, we agree with the district court that appellants produced no evidence demonstrating that Texaco gasoline was not easily interchanged with other gasoline and constituted a separate product market. Nor can it be inferred that Texaco intended to monopolize the entire gasoline market in southern New Jersey. The § 2 claim alleging conspiracy to monopolize cannot prevail because of appellants' failure to establish a conspiracy, as discussed above. Thus appellants' § 2 claim was properly removed from the jury's consideration.

IV.

■ Sweeney alleged violations by Texaco of § 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(a), and asked for both damages and injunctive relief.[5] The district court directed a verdict against Sweeney on the damage claim, concluding that Sweeney had failed to prove damages. In its role as factfinder, the court found that Sweeney had not established its case for injunctive relief. The Robinson–Patman issue is therefore before us in two different contexts, the damage aspect reviewable by this court on the standard of review applicable to all directed verdicts, and the injunction aspect reviewable by this court on the standard for reviewing legal error. Because we agree with the district court's construction of the Robinson–Patman Act in denying Sweeney's injunction claim, and with its conclusion that Sweeney proved no violation of the act, we do not reach the issue of damages.[6]

**5.** The Robinson–Patman Act claims asserted by Mission Gas Oil Company and Petroleum Products Company are discussed in section V, *infra.*

**6.** The district court refused to submit Sweeney's claim for damages to the jury on the ground that Sweeney failed to establish compensable damages. It relied on *Enterprise Indus., Inc. v. Texaco Co.*, 240 F.2d 457 (2d Cir.), *cert. denied,* 353 U.S. 965, 77 S.Ct. 1049, 16 L.Ed.2d 914 (1957). We adopted the analysis

of *Enterprise* in *Freedman v. Philadelphia Terminals Auction Co.*, 301 F.2d 830, 833–34 (3d Cir.), *cert. denied,* 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67 (1962). We agree with the district court that the amount of the illegal discrimination can only be used to quantify damages if the plaintiff demonstrates that the favored purchasers lowered their prices in an amount equivalent to the illegal benefit they received. *See Enterprise,* 240 F.2d at 459–60. Sweeney

■ A plaintiff seeking either injunctive or damage relief under the Robinson–Patman Act must demonstrate that the defendant has discriminated in price against the plaintiff and in favor of at least one of the plaintiff's competitors. It also must prove that the discrimination "may . . . substantially lessen competition." As we read the district court's opinion, it employed these grounds, operating together, in denying Sweeney's claim for injunctive relief. Although the district court sat as factfinder on the injunction claim, its conclusion rested not on a factual determination,[7] but on a construction of the statute.

Although Sweeney has never clarified the theory underlying its Robinson–Patman Act claim, in essence it contends that by changing the gasoline pickup point from Westville to Macungie, Texaco effectively imposed a discriminatory price on it. Sweeney alleges discrimination by comparing the price charged it to two different prices: the effective price of gasoline to it before the change of pickup points and the effective price of gasoline to other distributors whose bulk storage facilities were located farther from their pickup points. Sweeney's claim is more confusing because it has not explained whether the attack is on the hauling allowance system as a per se violation of the Robinson–Patman Act, or on the appliction of the system to Sweeney. Neither of these alternative theories for recovery states a violation of the act.

■ Under the Robinson–Patman Act, price discrimination requires "at least two completed sales by the same seller at differential prices to different purchasers." S.C. Oppenheim & G. Weston, Unfair Trade Practices and Consumer Protection: Cases

and Comments 816 (1974); see Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 702, 87 S.Ct. 1326, 1335, 18 L.Ed.2d 406 (1967). The proper comparison for determining whether a price discrimination has occurred is between the prices charged to two different customers. We therefore reject Sweeney's argument that it has shown improper discrimination merely by showing that Texaco charged it a different effective price at two distinct points in time.

Sweeney argues that the formula for calculating the hauling allowance, though available on equal terms to all distributors, resulted in price discrimination because the effective price of gasoline varied from purchaser to purchaser. The variations in price arose because Texaco calculated the hauling allowance based on the differing distances between each distributor's bulk plant and Texaco's pickup point, using the lowest rate from among common carrier, contract carrier, or Texaco delivery truck. Complications arose because distributors frequently did not travel the full distance, but instead delivered the gasoline directly from Texaco's pickup point to nearby retail stations. This practice allowed distributors, including Sweeney, to travel fewer miles than the hauling allowance compensated them for. The most advantaged distributors, therefore, were the ones with bulk plants far distant from the pickup point, but with retail stations close to the pickup point.

Sweeney's indictment of the hauling allowance system apparently concentrates on two separate aspects. First, Sweeney alleges that by changing its pickup point from Westville to Macungie, Texaco eliminated its locational advantage and put it at a disadvantage with respect to other distribu-

---

failed to prove that its competitors lowered their prices, and thus cannot rely on the amount of the alleged illegal discrimination to establish damages.

7. The court explicitly noted that it was not addressing, nor had Texaco submitted, a cost justification defense. 478 F.Supp. at 283 n.3. It relied on facts on which the parties were in substantial agreement, i. e., that Texaco chose

the distribution point pursuant to a contractual provision allowing use of the point most economical to Texaco, App. at 158a, and that Texaco realized a cost savings by changing Sweeney's point from Westville to Macungie. Other issues relating to the switch, such as conspiracy with Sweeney's competitors and predatory intent, are considered in relation to the Sherman Act claims, supra, and fail for lack of sufficient evidence.

tors. Second, Sweeney alleges that the hauling allowance as calculated was inherently discriminatory, and should be replaced with a "rational" hauling allowance system or scrapped altogether in favor of uniform prices at the pickup point. We reject both arguments.

A.

Under our analysis, the first argument merges into the second. Sweeney does not allege, and introduced no evidence to substantiate, that Texaco deviated from its hauling allowance formula by switching his pickup point from Westville, far from Sweeney's storage facility, to Macungie, much closer to his storage facility. We are faced, therefore, with a hauling allowance formula, uniform in structure and application, that produces differentials in the effective price of gasoline sold to Texaco distributors. Sweeney's first argument alleges no more than that the formula produced a higher effective price to him than to other distributors. The first argument cannot succeed unless we are persuaded that uniform application of the formula violates the act.

B.

The attack on the hauling allowance system assumes that such a system discriminates merely because it results in a different effective price to each distributor. Although the Supreme Court has said that "a price discrimination within the meaning of that provision is merely a price difference," *FTC v. Anheuser–Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960), the business reality of distributing gasoline over a large geographic region militates against elevating this isolated passage to an all–inclusive definition.[8]

We are persuaded by the Second Circuit's reasoning in *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), which supports Texaco's position that a uniform pricing formula applicable to all customers is not a price discrimination under the act. In *FLM*, Ford charged different prices to its parts customers according to the function, such as retail, wholesale, or repair, that each customer performed. In concluding that this practice was not a price discrimination under the Robinson–Patman Act, the court reasoned that the dual price was available, not only in theory but in fact, to all purchasers. It concluded that

the Act . . . requires equality of treatment among purchasers, but it does not require a seller to adopt a single uniform price under all circumstances. . . . This principle has been applied in cases which found no violation of § 2(a) in pricing plans which, though varying prices according to different terms of sale, were administered equally to all purchasers.

*Id.* at 1026 (citations omitted). We hold, therefore, that Sweeney has failed to establish that the hauling allowance formula discriminates in violation of the Robinson–Patman Act.

Our holding is not inconsistent with prior Supreme Court decisions that have found pricing formulas violative of the act. In *FTC v. Morton Salt Co.*, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), the Court held that Morton Salt's quantity discount system violated the act because the largest discounts were actually unavailable to the great majority of Morton's customers. *Id.* at 42–43, 68 S.Ct. at 826; *see also Mueller Co. v. FTC*, 323 F.2d 44, 46 (7th Cir. 1963), *cert. denied*, 377 U.S. 923, 84 S.Ct. 1219, 12

---

8. In *Anheuser–Busch*, the Court addressed a problem known as "primary–line price discrimination," in which Anheuser–Busch, a beer manufacturer, sold its beer at a lower price in the St. Louis market than it sold it in other places in the country. The FTC alleged price discrimination to the detriment of other beer manufacturers selling in the St. Louis market, and the Supreme Court agreed. The allegedly harmed parties in *Anheuser–Busch* were competitors of Anheuser–Busch, who would be affected regardless of whether Anheuser–Busch charged equal prices to all its customers in St. Louis. In this case, equal treatment of customers is the only issue because other gasoline refiners, competitors of Texaco, are not before the court.

L.Ed.2d 215 (1964). The Court emphasized that a major purpose of the Robinson–Patman Act was to eliminate the competitive advantage of a large buyer "over a small buyer solely because of the large buyer's quantity purchasing ability." 334 U.S. at 43, 68 S.Ct. at 826. In the case before us, it is the distributors, not Texaco, who determine where to place their bulk storage plants, and it is the distributors, not Texaco, who decide which retail stations they will supply. Texaco has no control over those decisions; it calculates the hauling allowance solely on the bulk plant's location in relation to the nearest pickup point. On this record, we cannot conclude that Texaco's formula forecloses any distributor from an advantageous hauling allowance. The record also fails to show that small buyers, whom the act was primarily intended to protect, are disadvantaged by the formula.

Nor does *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945), preclude the result we reach. Corn Products operated a delivered price system for glucose sold to all its customers throughout the midwest. The "base point" for its calculation of the delivered price was its plant in Chicago, although Corn Products actually delivered glucose from its Kansas City plant to customers near that plant. The result was a built–in favoritism, unjustified by the facts of delivery, for customers in the Chicago area. *Corn Products* differs from this case in an important respect. In that case, the manufacturer was utilizing two shipping points, but calculating its freight charges as if it were using only one. The result was that customers close to the Kansas City plant were arbitrarily deprived of the locational advantage similar to the one held by customers close to the Chicago plant. Instead, they were placed at a great disadvantage in an industry in which "differences of a fraction of a cent . . . [were] sufficient to divert business from one manufacturer to another. . . ." *Id.* at 742, 65 S.Ct. at 969. In this case, all relevant allowances are calculated on mile-

age between the actual shipping point and the customer's bulk storage facility. The formula is therefore not discriminatory.

Sweeney responds with two arguments. First, it notes that customers of Texaco get the benefit of the allowance based on distance from their plant to Texaco's plant, but in reality rarely travel the full distance. Because Texaco is aware of the common practice of delivering gasoline to retail stations directly from Texaco's plant rather than from the bulk storage facilities, Sweeney argues, Texaco is in fact sanctioning discriminatory prices. Sweeney asks this court to mandate f. o. b. shipping point pricing to eliminate this abuse of the hauling allowance. In rejecting this argument, we rely on the teaching that the Robinson–Patman Act should not be construed "in a manner which runs counter to the broad goals which Congress intended it to effectuate." *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968). Sweeney's argument is apparently based on some perceived duty of a manufacturer to assure that uniform discounts are not abused by customers. Even if we were persuaded that closer supervision of the hauling allowance would be better commercial practice, we would decline to impose a particular pricing strategy on a market as complex as the gasoline market merely because the current system may be imperfect.[9] Indeed, the record fails to support the proposition that competition in this market, as distinguished from a particular competitor, would benefit by our mandating the inflexible approach urged by Sweeney.

■ Alternatively, Sweeney would have us require Texaco to calculate, on a station by station basis, the actual mileage travelled by the distributors in making their deliveries. This requirement would impose a substantial administrative burden on Texaco, requiring it to adjust the allowance on a sale by sale basis. It would also eliminate Texaco's ability to base the hauling allow-

9. Congress rejected an amendment to the Robinson–Patman Act that would have required f. o. b. shipping point pricing. *See Corn Products*

*Refining Co. v. FTC*, 324 U.S. 726, 737, 65 S.Ct. 961, 966, 89 L.Ed. 1320 (1945).

ance on established rates since rates for the multiplicitous points, corresponding to each retail station, may not be readily available. Given the evenhanded application of the formula, we do not think the Robinson–Patman Act requires us to impose this burden on Texaco. Moreover, Sweeney has failed to demonstrate that Texaco's alleged failure to calculate its allowance in the most precise manner may have the substantial effect on competition required by the act. *See Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855 n.6 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 721–22 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *M.C. Manufacturing Co. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1066 (5th Cir. 1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Lloyd A. Fry Roofing Co. v. FTC*, 371 F.2d 277, 281 (7th Cir. 1966). Indeed, the allegations of adverse competitive effect are related only to the change in Sweeney's pickup point from Westville to Macungie. Sweeney failed to introduce evidence from which an inference could be drawn that the allowance formula per se has a substantially adverse effect on competition, rather than merely an adverse effect on it, a competitor.

Sweeney's second response is that Texaco has deviated from uniform application of its formula. Only one instance is cited in which Texaco allegedly deviated from the formula. We need not address Sweeney's argument that this deviation constituted a violation of the act because Sweeney has failed to prove both that it was in any way affected by this deviation[10] and, if it were

harmed, the extent of its damages directly related to this allegation.[11] We conclude, therefore, that Sweeney produced insufficient evidence to create a jury question, or to justify an injunction, on this issue.

Accordingly, the district court's order directing a verdict for Texaco on Sweeney's Robinson–Patman Act damage claim and the order denying its injunction claim will be affirmed.

V.

We have considered the other contentions presented by Sweeney, Mission Gas Oil Company, and Petroleum Products Company. We conclude there was no error in the choice, interpretation, or application of legal precepts [12] by the district court and do not regard as clearly erroneous the district court's findings of fact in denying the plaintiffs' claims for injunctive relief. The plaintiffs failed to demonstrate that Texaco violated §§ 1 and 2 of the Sherman Act. On this basis alone the plaintiffs' requests for injunctive relief were properly denied.

On June 1, 1979, the court granted, in part, Texaco's motion for partial summary judgment and dismissed Mission's and Petroleum's claims for damages. The district court's decision was correct. Neither of these companies purchased fuel from Texaco, but were Sweeney's customers. Consequently, under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and *Klein v. Lionel Corp.*, 237 F.2d 13 (3d Cir. 1956), they cannot assert claims for damages under §§ 1 and 2 of the Sherman Act or § 2(a) of the Robinson–Patman Act.

---

10. Undisputed evidence at trial indicated that Texaco increased Farm & Home Oil Company's hauling allowance after Sun Oil Company tried to induce Farm & Home to cease distributing Texaco gasoline and instead to distribute Sun gasoline. Even assuming a jury could reject Texaco's meeting competition defense under § 2(b), 15 U.S.C. § 13(b), with respect to this transaction, Sweeney neither alleged nor proved that it was harmed by this particular event.

11. *See* note 6, *supra.*

12. We specifically reject appellants' assertion of error based on the district court's refusal to admit evidence of Temporary Voluntary Allowances (TVA's). Texaco gave its wholesalers these allowances in order to assist Texaco retailers in meeting price competition from other retailers. Prior to trial, Sweeney conceded TVA's had nothing to do with the case. The district court correctly excluded TVA evidence.

The district court, sitting as trier of fact, concluded that Texaco was entitled to injunctive and declaratory relief on its counterclaims. Texaco alleged that Sweeney commingled Texaco gasoline with non–Texaco gasoline, sold non–Texaco gasoline and diesel fuel as Texaco product and used trucks carrying the Texaco brand to deliver non–Texaco fuel. Texaco asserted that it was entitled to relief on various grounds. Based on the evidence presented the court concluded that Sweeney's conduct violated §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), § 1 of the New Jersey Unfair Competition Act, N.J. S.A. § 56.4–1, § 201(g) of the New Jersey Unfair Motor Fuels Practices Act, N.J.S.A. § 56:6–2(g), and the common law of unfair competition, and breached its distributor agreement. At trial Richard Sweeney repeatedly admitted commingling fuel, and the other evidence of infringement, unfair competition, and breach of contract is overwhelming and uncontroverted. The statutes are clear on their face, and their plain meaning is supported by the case law. We affirm the district court essentially for the reasons set forth in its opinion. 478 F.Supp. at 277–82.

Accordingly, we will affirm the judgment of the district court in all respects.

SLOVITER, Circuit Judge, dissenting.

It is an undisputed tenet in the allocation of the judge/jury functions that a trial court cannot pass upon the weight or credibility of the evidence in ruling on a motion for a directed verdict. *Brady v. Southern Railway*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); *Burchill v. Kearney–National Corp.*, 468 F.2d 384 (3d Cir. 1972). *A fortiori*, the appellate court is bound by the same limitation on review. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696–97, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). I dissent from the majority's affirmance of the directed verdict on plaintiffs' Sherman Act § 1 count for two reasons. I believe that both the trial court and the majority have arrogated to themselves the jury's function

of determining which inferences can reasonably be drawn from the evidence before it. But my disagreement with the majority goes deeper than whether the trial court overstepped the permissible boundary in this case, admittedly an *ad hoc* determination. More · significantly, I also disagree with the majority in its restrictive interpretation as to the quantum of evidence needed to bring action within § 1 of the Sherman Act. I believe the majority retreats from prior decisions of this court, disregards the realities of market behavior, and ignores the virtual impossibility of producing direct evidence of unlawful combinations. I fear that the majority's decision will unduly hamper plaintiffs in their ability to conduct this type of antitrust litigation.

I.

A.

Sweeney was a distributor of gasoline to discount stations, some of which he owned or operated, usually referred to in market jargon as "price–cutters." While price–cutters selling non–branded products are not well–regarded by their competitors, Sweeney's reputation among its competitors was even lower because it and the stations to which it sold price–cut a branded product, Texaco gasoline. Under the economic theory upon which the antitrust laws are based, Sweeney's competitors should have sought to meet its competition in the marketplace. As a practical matter, however, we know that displeased competitors may attempt to thwart a discounter's price competition by a much more direct route. They may seek to thrust at the jugular of that competition by complaints to their mutual supplier, in an attempt to induce the supplier to take action to control or coerce the "offensive" market behavior or to cut the discounter out of the market altogether by terminating its source of supply.

The case law is replete with instances of such action by a discounter's competitors. For example, franchised General Motors dealers sought to avert the competition from discount outlets of General Motors

cars by resorting to the "ultimate power" of the supplier, and enlisting General Motors' aid. *United States v. General Motors Corp.*, 384 U.S. 127, 136, 86 S.Ct. 1321, 1326, 16 L.Ed.2d 415 (1966). Another illustration appears in *Uniroyal, Inc. v. Jetco Auto Service, Inc.*, 461 F.Supp. 350, 354–55 (S.D.N.Y. 1978), where complaints from a franchised dealer of Uniroyal tires about price competition from a competing franchised dealer led to Uniroyal's decision to terminate the price–cutter.

Most such cases have been decided on the issue whether the circumstances warrant application of the *per se* approach, an issue not before us on this appeal. However, until now, there has not been any serious question in this circuit that the competitors' complaints to the supplier about the discounter's market behavior and the supplier's action in response thereto are sufficient to constitute the "combination"[1] necessary to bring the matter within the scope of section 1 of the Sherman Act. In *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979), we recognized that when a manufacturer takes action at the behest of a customer, such action can no longer be considered unilateral and is therefore subject to the prohibitions of the antitrust laws. In *Mannington Mills, Inc. v. Congoleum Industries, Inc.*, 610 F.2d 1059, 1069–70 (3d Cir. 1979), we held that allegations that Congoleum terminated plaintiff's foreign licenses "in response to" complaints by Congoleum's foreign licensees about plaintiff's excessive competition and to the foreign licensees' threats to terminate their own licenses stated a sufficient claim under the antitrust laws. Both cases were decided on the premise that action by the manufacturer in response to the customers' complaints would constitute the "combination" needed to meet the jurisdictional predicate of Sherman Act § 1. If that postulate had not been accepted, there would have been no point to our judgments returning the cases

to the district courts for further proceedings.

Now, the majority, holding directly to the contrary, states "that even if appellants had demonstrated that Texaco's actions were in response to these complaints, such evidence alone would not show the necessary concerted action." At 110. It affirms the district court which held that "evidence of competitors' complaints standing alone cannot support a finding of liability under § 1 of the Sherman Act." 478 F.Supp. 243, 255.

The majority cites no authority to support the proposition that complaints and responsive action cannot constitute a combination or conspiracy under the antitrust laws. The district court relied on four cases to support its acceptance of that proposition. For our purposes, central among the cases cited is this court's decision in *Klein v. American Luggage Works, Inc.*, 323 F.2d 787 (3d Cir. 1963). In citing that case to support the proposition that something more is needed to create a combination than mere complaints and responsive action, the district court overlooked the fact that the *Klein* decision turned on the circumstance that there was no evidence that the manufacturer ever received the competitor's complaints, which were made to its sales representative and not directly to it. *Id.* at 791. Under that circumstance there could be no combination with the manufacturer. Thus, the court in *Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584 (S.D. N.Y.1968), another of the authorities cited by the district court in this case, erroneously relied on the *Klein* decision in rejecting the inference of conspiracy from the fact of customer complaints and the manufacturer's actions. *Id.* at 588. The other appellate court case relied on by the district court here, *Westinghouse Electric Corp. v. CX Processing Laboratories, Inc.*, 523 F.2d 668 (9th Cir. 1975), also contains no analysis of the principal issue which concerns us

1. The majority's suggestion that "contract, combination or conspiracy" under section 1 of the Sherman Act is one concept, instead of discrete terms, at 111, is simply wrong. It is refuted by the discussion of the Supreme Court

in *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43–47, 80 S.Ct. 503, 511–13, 4 L.Ed.2d 505 (1960), where the distinction between agreements and combinations was made.

here, whether evidence showing complaints and responsive action constitutes a Sherman Act § 1 combination. In the *Westinghouse Electric* case, there were no complaints from plaintiff's competitors about its marketing practices. Instead, the court expressly noted that the calls from competing distributors were not complaints but were requests for a favorable price arrangement similar to the one Westinghouse had bestowed upon the plaintiff. *Id.* at 674. Hence, that case cannot serve as very persuasive authority for the proposition for which it was cited by the district court.

Instead, in the Ninth Circuit case where a fact situation similar to that presented here was considered, the court took a realistic view of the impact of complaints by competitors and the reaction of the manufacturer/supplier. In *Girardi v. Gates Rubber Company Sales Division, Inc.*, 325 F.2d 196 (9th Cir. 1963), the court reversed the decision of the district court in granting a directed verdict after the plaintiff's evidence was presented to the jury. In that case, as here, plaintiff based its claim of conspiracy on the complaints of a competitor and the responsive action of the manufacturer in cutting off the price–cutter's source of supply. The court stated:

> It seems to us to be clear that if the facts here, as claimed by the appellant, are that Oranges as a competitor of Girardi, the price cutter, induced and participated in action which resulted in Girardi being cut off from a supply of this merchandise, then the case would be precisely within the rationale of *United States v. Socony–Vacuum Oil Co., supra*, for it is normally the competitor who is being hurt by price cutting who is likely to seek coercive action against the competitor who is hurting or likely to hurt him. We would think that a typical case of illegal conspiracy to fix prices would arise from the desire of one dealer to eliminate his price cutting competitor through concerted action with the manufacturer.

*Id.* at 200.

It is difficult to understand why the majority seriously contends that if a manufacturer reacts to complaints by its customers by cutting off the offending discounter or otherwise hampering its competition, this is not sufficient to establish a conspiracy or combination. A long and unbroken series of decisions has established that action which on the surface appears to be unilateral behavior can be considered to be part of a combination when viewed in light of the surrounding circumstances. *See, e. g., Eastern States Retail Lumber Dealers' Association v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

Given the undisputed evidence in this case of competitor complaints, it would be a fair inference that such complaints were designed to elicit some action on the part of Texaco. As Judge Pope stated in *Girardi.*, "The very act of complaining carries the meaning: 'I want you to do something about it.'" 325 F.2d at 202. The district court here, however, refused to acknowledge that such complaints might constitute the foundation of a Sherman Act § 1 combination since "[i]t would be inequitable to hold that the mere receipt of a complaint creates an inference of a combination between the recipient and the complainant." 478 F.Supp. at 257. Plaintiffs, of course, do not suggest that *mere receipt* of a complaint is enough to turn a passive manufacturer into a conspirator. It is only when the manufacturer responds to such complaints by taking action that the *sine qua non* of a combination has been created by the addition of another party. Furthermore, the mere fact that the manufacturer/supplier took some action will not suffice to establish the requisite combination unless such action were taken in response to such complaints. However, if it were, then the components of a combination have been proven. *See United States v. Uniroyal, Inc.*, 300 F.Supp. 84, 90 (S.D.N.Y.1969).

B.

The district court found, and the majority agrees, that plaintiffs failed to offer sufficient evidence to permit a reasonable inference that Texaco changed Sweeney's hauling allowance or terminated its distributor agreement because of competitors' complaints. Viewing plaintiffs' testimony in the light most favorable to them, which we must on reviewing a grant of a directed verdict, I believe a jury could have found that Sweeney's competitors complained about its pricing policies vigorously and in great number, that these complaints were of concern to Texaco management, and that Sweeney's pricing policies and market behavior played a part in Texaco's decision to change its hauling allowance and ultimately to discontinue its distributor arrangement.

In this case, unlike some of the others where a manufacturer/supplier has defended its actions on the ground of unilateral action, the evidence is undisputed that there were numerous complaints, that they were received by Texaco, and, even more significantly, that they came to the attention of the Texaco officials who made the decisions to take the actions against Sweeney. The majority opinion fails to note the extent or volume of such complaints. Such complaints were far from isolated. Nor did they stem only from an individual dissatisfied competitor. In fact, complaints about Sweeney's pricing policies by several statewide associations of service station dealers were the subject of discussion among Texaco officials. Furthermore, complaints about Sweeney were made directly to Texaco. Daniel A. Doherty, who in 1971 was the Regional Manager of Texaco's Philadelphia region and who made the decision to terminate Sweeney's distributorship, was aware of complaints from retailers and distributors concerning Sweeney's price–cutting tactics well before he made that decision. For example, he admitted receiving a copy of a memorandum written by Edward C. Enstice, Assistant Regional Manager, wholesale, of Texaco, stating that W. A. Fluhr of W. A. Fluhr, Inc., one of Sweeney's distributor competitors, had visited Enstice to complain that Sweeney's low prices were adversely affecting his business. Paul B. Hicks, Jr., Vice President of Sales, U.S., Texaco, who was consulted concerning the Sweeney termination was also aware prior to the attempted termination of complaints of other Texaco retailers about Sweeney's underselling. Carlos Leffler, Inc., a Texaco wholesaler, had complained in writing directly to Hicks by letter dated September 1971 about Sweeney's underpricing.

James P. Rodden was a former retail supervisor and marketing representative for Texaco in the South Jersey and Eastern Pennsylvania region during the relevant period, and in this capacity was in charge of 60 to 70 Texaco stations. He testified that beginning in 1967, numerous retailers had complained to Texaco about being undersold by nearby Texaco stations, which were supplied by Sweeney. Unlike cases where such testimony is vague and inconclusive, Rodden was able to identify seven such complainants. Moreover, he testified that in regular meetings attended by Texaco's district manager and the marketing staff, the marketing representatives proffered competition from Sweeney stations as an explanation for lost volume at some of Texaco's investment stations. Finally, Enstice, the Texaco official referred to above, also testified that in 1971, Texaco received complaints regarding Sweeney's pricing practices from Texaco retailers, wholesalers, and distributors. Enstice transmitted these complaints to R. W. Smithwick, Texaco's general manager of sales in its marketing headquarters. As a result, Smithwick subsequently travelled to Philadelphia to examine Sweeney's marketing area first–hand.

The majority concludes that there was no credible evidence from which a jury could permissibly infer that Texaco's actions were in response to these complaints. In drawing this conclusion, the majority excerpts some of the testimony on which plaintiffs rely and combs through it to see what weight or credibility can be attached to it. The pertinent issue, of course, is not what the majority deems to be the reasonable

inferences that can be drawn from the testimony but what the jury believes to be the reasonable inferences that can be drawn from the testimony.

When viewed by the proper standard, I believe that a reasonable jury could have drawn the inference of responsive action. One of plaintiffs' witnesses, Glenn Murray, who significantly had no connection with either plaintiff or defendant (having left Texaco in 1973), testified to his belief that Texaco had terminated Sweeney because of Sweeney's competitive abilities as against other Texaco retailers and wholesalers. Murray, a Texaco employee since 1953, was close to the "center of the action," having been employed as the district sales manager of the Philadelphia district in 1971 and as assistant district sales manager prior to that time. Murray was responsible for "everything and anything" in the Philadelphia district and was thoroughly familiar with Sweeney's business. Murray's extensive experience at Texaco and knowledge of the realities of the way in which its business decisions are made lends credence to his conclusion that Sweeney's marketing strategy, and not customer complaints, was responsible for Texaco's actions. Certainly a similar inference by the jury was permissible, albeit not compelled. The majority's disregard of Murray's testimony because he "did not refer to complaints of price cutting," at 114, is surprising in light of Murray's testimony that Texaco sales representatives complained to him that Sweeney's stations had a "pricing structure . . . lower than [Texaco's] own retailers were able to price . . . ."

Plaintiff also introduced the testimony of Doherty, the Texaco official who made the decision to terminate Sweeney's distributorship, who admitted that he was aware that Sweeney's attraction was "based upon posting a price generally lower than major brand price in the areas," that its outlets were locations with "a low, highly competitive retail price", that Sweeney's "marketing strategy" "relied entirely on having the lowest or one of the lowest prices", and that Sweeney's "marketing strategy" was among the elements which entered into his decision to terminate it. The majority places great stress on Doherty's assertion that Sweeney's pricing was his prerogative and that of the people he serviced. But the jury was entitled to discount the self–serving portion of Doherty's testimony (particularly in light of the fact that Doherty is still employed by Texaco) and to draw the inference that Texaco had capitulated to the pressure of Sweeney's competitors.

The testimony of these witnesses and the surrounding circumstances would support a jury's inference that Texaco acted in response to the numerous complaints it had received. To be sure, that was not the only inference permissible from the evidence. Texaco attempted to show that the motivation for its actions against Sweeney was the customer complaints it had received, and that Sweeney commingled Texaco's gasoline with other refiners' gasoline. But these are arguments directed to the jury, and the jury, acting as the reasonable voice of the community, must decide which explanations are the more plausible. I doubt that we would not be bound to sustain its decision, however it ultimately came out.

The majority's statement that because the change in Sweeney's hauling allowance was less than one cent per gallon, it "is difficult to accept" Sweeney's claim that the change was taken in response to complaints citing price differentials of several cents, at 114, is illogical. The amount of the reduction of Sweeney's allowance does not go to the issue of whether it was responsive to the competitors' complaints. Indeed, Texaco may have believed that some reduction of Sweeney's allowance on its part would permit it to assuage the complaints of the competitors while retaining the business of Sweeney. That Texaco may have wanted the best of both worlds does not foreclose the possibility that its action, in whatever form, was taken in response to the complaints it received. The majority's treatment of this fact patently demonstrates that it is usurping the jury's legitimate function.

The majority discounts the testimony of Rodden, Doherty and Murray which it cites in detail. Apparently it does so because none of them testified that they knew *as a fact* that Texaco took its actions against Sweeney in response to the competitors' complaints. I assume that the reference to "narrative or historical matters" in the learned discourse in Part II D of the majority's opinion is to the objective fact of such a causal connection, and that it is intended to contrast facts with inferences. But inferences are all that one can reasonably expect in such cases.

Although the majority purports to take cognizance of the difficulty of proving an antitrust conspiracy by direct evidence, the effect of its decision will be to require nothing less than direct evidence of a causal connection between Sweeney's competitors' complaints and Texaco's actions. The district court was explicit on this point, faulting plaintiff because "Sweeney never even attempted to introduce any evidence that Texaco either responded to the complainants or told Sweeney that it would take any action in response thereto." 478 F.Supp. at 257. It cannot be so naive as to expect that a sophisticated business concern like Texaco will have maintained records which make such a direct causal connection, or that its officers, well trained in the technicalities of the antitrust laws, will testify to that effect. The courts have recognized that "in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). *See also Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969). As Justice Black stated in a different but analogous context:

> The existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide. In this case petitioner may have had to prove her case by impeaching the store's witnesses and appealing to the jury to disbelieve all that they said was

true in the affidavits. The right to confront, cross–examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases.

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176, 90 S.Ct. 1598, 1618, 26 L.Ed.2d 142 (1970) (concurring).

The issue of whether a combination may be inferred has been most directly presented in the cases where plaintiff has produced evidence only of parallel action. In *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), the Court affirmed a finding that parallel action by motion picture distributors in responding to a demand by one of their leading motion picture theatre chains with identical and complex counteroffers permitted the inference of a conspiracy. On the other hand, in *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), the Court affirmed a finding that parallel action by motion picture producers and distributors in refusing to grant a suburban theatre first–run features did not constitute a conspiracy in violation of the antitrust laws. What is significant about these seemingly inconsistent decisions for our purposes is that both cases were given to their respective juries so that the juries could determine the inferences to be drawn from the parallel behavior. In fact, in *Theatre Enterprises*, the Court specifically stated, "To be sure, business behavior is *admissible circumstantial evidence from which the fact finder may infer agreement."* Id. at 540, 74 S.Ct. at 259 (emphasis added).

## II.

The majority's decision appears to be based on the alternative holdings that something more than competitors' complaints and manufacturer/supplier action is needed to show a Sherman Act § 1 combination or conspiracy, and that, in any event, the plaintiff did not provide sufficient evidence that Texaco's action was responsive to the complaints. Part I of this dissent

dealt with the latter holding. Even if the majority and the district court are correct that "something more" is needed, a fair reading of the record discloses that there is sufficient evidence of "something more" to permit that issue also to go to the jury.

The search for "something more" stems from the line of cases where the plaintiffs have sought to have the trier of fact infer the requisite combination or conspiracy from mere parallel action, usually refusals to deal, when there is no direct evidence of combined action. See L. Sullivan, Antitrust § 110 (1977). This "plus factor", as it is sometimes called, has been used in the parallel action cases even in the absence of evidence of communication between the alleged conspirators to permit the inference of a combination from external factors.[2] Of course, in this case, there was direct evidence of communication, and therefore the requirement of a "plus factor" for that purpose is superfluous.

In any event, a sufficient "plus factor" can be found by evidence that the actions taken were in contradiction of the actors' own economic self–interest. *See Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1314 (3d Cir. 1975). This is the key to reconciliation of the Court's decisions in *Interstate Circuit* and *Theatre Enterprises*. As previously noted, in both of those cases the jury was permitted to decide the subsidiary question of what was in the actors' self–interest in determining the ultimate fact question of whether there was a combination.

In this case, the majority itself has decided that issue, stating that, "Clearly, by lowering the hauling allowance, Texaco acted in its self interest, and was not proceeding contrary to its 'own economic interests.' The change saved it $58,000 per year on sales to Sweeney." It continues, "This *undisputed fact* negates an inference of concerted action...." At 114 (emphasis added). However, Texaco's claim that it acted in its own self–interest in changing Sweeney's hauling allowance was vigorously challenged by Sweeney. Texaco introduced only two studies calculating the savings Texaco would secure by designating Macungie, Pennsylvania rather than Westville, New Jersey as Sweeney's pick–up point. The first, showing a savings of about $2,200, was prepared in 1966. It is unlikely that this study, made some four years before Texaco changed the pick–up point and based on 1966 freight rates, was the basis of Texaco's decision in 1970. The second study, prepared on the eve of the trial at the request of Texaco's counsel, purported to show that Texaco would save $58,000 from a change in delivery point. It is self–evident that Texaco could not have relied on a 1979 study in making a 1970 decision. Texaco introduced no cost–saving studies that were contemporaneous with its decision to change delivery points, from which a trier of fact might conclude that none exist. Sweeney also argued that Texaco's failure to study the possibility of reducing its costs by changing the pick–up point of Sweeney's competitors suggests that cost saving was not Texaco's motivation. Certainly, a trier of fact was entitled to infer from the above that Texaco used the purported cost savings as a cover for its real motivation, which was to meet the persistent and pervasive complaints it had received about Sweeney's market action.

Even if Texaco had known in 1970 that it would save $58,000 by changing Sweeney's pick–up point, the conclusion is not inescapable that such a change was to Texaco's benefit. A change in Sweeney's hauling allowance would reduce the amount of gasoline that Sweeney sold, and thereby reduce Texaco's profits from Sweeney's purchases. Furthermore, it is not at all clear that the termination of Sweeney's distributorship was in Texaco's self–interest. Texaco does not contend that Sweeney was a fly–by–

---

**2.** In the absence of explicit Congressional guidelines, the courts have been unwilling to hold that consciously interdependent action by firms in a oligopolistic market is an adequate substitute for the "contract, combination, or agreement" required by section 1 of the Sherman Act, although such action creates anticompetitive effects equivalent to those from an explicit combination.

night operator. To the contrary, Sweeney has been a Texaco wholesaler and distributor since 1958 and, prior to the present controversy, its general relationship with Texaco was good, with Sweeney usually receiving the prompt payment discount on purchases from Texaco. In addition, Sweeney was very successful in its business, to the benefit of both itself and Texaco. It won a contest sponsored by Texaco in 1968 for having the greatest increase in gallonage among area wholesalers. 478 F.Supp. at 249. And in 1971, the very year Texaco terminated Sweeney's distributorship, Sweeney was Texaco's leading distributor in the Southeastern Pennsylvania/Southern New Jersey area, purchasing over 28 million gallons of gasoline.

Under the majority's view of the law, there are two factual issues critical to the ultimate finding as to whether there was a combination or conspiracy in this case. One is whether Texaco acted in response to Sweeney's competitors' complaints. The other is whether Texaco's actions were consistent with its self–interest. The majority decides both issues adversely to plaintiffs, thus invading the province of the jury.

### III.

In its decision that plaintiffs had not produced sufficient evidence to permit the inference of a combination or conspiracy, the majority has failed to make the necessary analytic distinction between conduct which constitutes a combination or conspiracy, on one hand, and combinations or conspiracies which violate the antitrust laws, on the other. Underlying the majority's out–of–hand rejection of the possibility that there was a combination in this case may be its belief that such conduct does not or should not violate the antitrust laws. However, that confuses two separate issues: whether there was conduct that can fairly be considered to have been joint or concerted, and the standard by which such conduct should be evaluated for purposes of antitrust liability. Consideration of whether antitrust liability should be imposed for business decisions made by a manufacturer

in arranging its distribution structure is appropriate in determining the standard by which such action, if joint, should be judged. There may be ample basis for arguing that such vertical arrangements do not always lend themselves to the *per se* approach, but must be evaluated in the context of the effect on competition. This issue was considered by Judge Adams in writing for this court in *Cernuto, Inc. v. United Cabinet Corp., supra.* In holding that the *per se* approach was warranted under facts analogous to those alleged here, he wrote, "When a marketing decision, although ostensibly taken by a manufacturer, is in fact the result of pressure from another customer, such a decision must be scrutinized more closely than solely unilateral action might be." 595 F.2d at 168. He continued, "if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level." *Id.* His discussion recognizes that ostensibly vertical and unilateral action may, on closer analysis, have precisely the anticompetitive impact which the Sherman Act is designed to avoid. I do not profess to decide whether Texaco's actions in this case fall within that mold. That was, of course, the ultimate question which the jury was precluded from deciding by the directed verdict.

In a recent en banc decision of this court in another case alleging an antitrust conspiracy, we reversed the action of the district court which had granted a directed verdict based on its conclusion that the only activity which plaintiff proved was unilateral. *Larry V. Muko, Inc. v. Southwestern Pennsylvania Building & Construction Trades Council*, 609 F.2d 1368 (3d Cir. 1979). We reiterated that looking at all the circumstances, the jury could have found the agreement which the district court was unwilling to infer. In *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical*

*Corp.*, 579 F.2d 20, 32–35 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978), we reversed the entry of a directed verdict in another antitrust case where the district court had also determined there was inadequate evidence to allow a jury to find the requisite conspiracy. We noted that the evidence on which the district court relied was challenged, and hence was for the jury. Implicit in these decisions is the recognition that a mechanistic search for direct evidence of a combination diverts consideration away from the more significant issue, which is the appropriate treatment of such conduct under the antitrust laws.

Certain statutes, such as those designed to produce equality or opportunity to minorities, women, retarded persons, on one hand, and those designed to insure an open economic system for all firms in the market, on the other hand, stem from conscious congressional policy judgments about the way in which our society should be ordered. Courts can, but should not, frustrate those public policy judgments by engaging in judicial interposition through the imposition of technical obstacles to achievement of the legislatively mandated goals.

The need to show that defendants' actions were part of a combination of conspiracy which falls within § 1 of the Sherman Act must be approached realistically, with an understanding of the various threads from which the fabric of business decisions are woven. If we are unwilling to allow the jury, which brings the community's experience to the fact finding process, to exercise its own judgment in making the reasonable inferences from the evidence, we will have unduly, and I think unwisely, restricted its function in antitrust cases.